# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


AMERICAN AUTOMOBILE      )
INSURANCE COMPANY,       )
a Missouri corp.,        )
                         )
        Plaintiff,       )
                         )
        vs.              )   09 CV 01589
                         )
BRIAN D. McCLURE &       )
ASSOCIATES, LTD.,        )
et al.,                  )
                         )
        Defendants.      )


        The deposition of BRIAN D. McCLURE,

called for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before THERESE M. SONNEMAKER,

CSR No. 84-2414, within and for the County of

Will, State of Illinois, and a Certified Shorthand

Reporter of said state, at 2067 Burlington Avenue,

Lisle, Illinois, on the 16th day of February, A.D.

2010, at 1:30 p.m.

## Page 2

```
 1    PRESENT:
 2         THE LAW FIRM OF HINSHAW & CULBERTSON,
           by:
 3         MR. DANA RICE,
           (222 North LaSalle Street
 4          Suite 300
            Chicago, IL  60601),
 5
               on behalf of the Plaintiff;
 6
           THE LAW FIRM OF CONNELLY ROBERTS &
 7         MCGIVNEY LLC, by:
           MR. JEFFREY J. SCOLARO,
 8         (55 West Monroe Street
            Suite 1700
 9          Chicago, Illinois 60603);
10            on behalf of the Deponent;
11         THE LAW FIRM OF KAVANAGH GRUMLEY &
           GORBOLD, by:
12         MR. ROBERT R. GORBOLD,
           (111 North Ottawa
13          Joliet, IL  60432),
14            on behalf of the Defendant, Genie
              Temporary Services.
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1            I N D E X
      WITNESS              EXAMINATION
 2    BRIAN D. MCCLURE
 3      DX By MR. RICE         Page 5, 90
 4      CX By MR. SCOLARO      Page 86, 92
 5
           E X H I B I T S
 6    NAME           MARKED FOR ID
      MCCLURE Deposition
 7      Exhibit
 8       Nos. 1-5              93
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1              (Witness sworn.)
 2        MR. RICE:  Mr. McClure, my name is Dana
 3    Rice. I represent American Automobile Insurance
 4    Company, the plaintiff, in the lawsuit, American
 5    Automobile Insurance Company versus McClure &
 6    Associates, case number 09 CV 1589.
 7        Let the record reflect this is the
 8    deposition of Brian D. McClure taken pursuant to
 9    notice and in accordance with the United States
10    Federal Rules of Civil Procedure for the United
11    States District Court.
12        I am going to be asking you a series
13    of questions today relating to the lawsuit.  Just
14    a few ground rules.  Let me finish my question
15    before you answer. That's for the benefit of the
16    court reporter so she can take down the questions
17    and answers completely.   Let me finish my entire
18    question before you answer.  I know that sometimes
19    during the course of a conversation you know
20    exactly what I am asking.  You know what answer
21    you're going to give me.  Just for the benefit of
22    the court reporter it helps her take those down.
23        It's also important to make all your
24    responses verbally as opposed to nodding your
```

## Page 5

```
 1    head.  Again, the court reporter can only take
 2    down the spoken word.
 3        Again, if any of my questions you
 4    don't understand what I am asking, let me know.
 5    I'll be happy to rephrase or try to ask a better
 6    question.
 7        If you answer my question, I will
 8    assume you understood what it was I was asking for
 9    and that was your answer.  Okay?
10        Then at any time you want to take a
11    break, use the restroom, fine by me.  I will stop.
12        BRIAN D. MCCLURE,
13    called as a witness herein by the Plaintiff,
14    having been first duly sworn, was examined upon
15    oral interrogatories and testified as follows:
16        DIRECT EXAMINATION
17        BY MR. RICE:
18      Q.  Couple things at the outset, is there
19    any medicine that you're taking that would prevent
20    you from giving anything but complete and truthful
21    answers to my questions today?
22      A.  No.
23      Q.  Did you review any documents in
24    preparation for your deposition today?
```

Page 6

1  A. No.
2  Q. Have you spoken to anyone about your
3  deposition today?
4  A. Jeff came and told me, you know, we were
5  going to be having a deposition. I have taken
6  depositions before so --
7  Q. That was, in fact, my other question.
8  How many depositions have you given before?
9  A. Probably four or five.
10  Q. What kind of cases were those
11  depositions in?
12  A. Divorce.
13  Q. Is that the only type of case?
14  A. Yes.
15  Q. I know your middle initial is D. What
16  does that stand for?
17  A. Donovan.
18  Q. What is your date of birth, sir?
19  A. 3/9/55.
20  Q. Where do you currently live?
21  A. 2248 Hidden Creek Court, Lisle,
22  Illinois.
23  Q. Sir, have you ever been convicted of a
24  felony or a misdemeanor involving dishonesty?

Page 7

1  A. No.
2  Q. Where are you currently employed?
3  A. B.D. McClure & Associates.
4  Q. How long have you been employed there?
5  A. Since I started the agency back in 1981.
6  Q. What is your current job title within
7  the company?
8  A. I am the president.
9  Q. Has the business been operating since
10  1981?
11  A. Yes.
12  Q. What exactly do you do for the business?
13  A. I am a representative. I am in charge
14  of procuring contracts, agency contracts, with
15  companies in helping our producers to sell
16  business and to oversee the operations of the
17  agency.
18  Q. So would it be fair to say that you're
19  responsible for the day-to-day operations of the
20  company?
21  A. Yes.
22  Q. Are you a licensed insurance broker?
23  A. Yes.
24  Q. Where are you licensed?

Page 8

1  A. In the State of Illinois, Minnesota,
2  California, Indiana, North Carolina, South
3  Carolina, Texas, Wisconsin, Indiana, Pennsylvania,
4  and some various other states. I am really not
5  sure off the top of my head.
6  Q. With respect to the Illinois license,
7  did you have to complete any education or training
8  to get that license?
9  A. Yes.
10  Q. What did you have to do to obtain that
11  license?
12  A. I had to pass the agency's agent testing
13  that took place back in the '80s and each year or
14  every other year I have to do 30 hours of
15  continuing education.
16  Q. How long have you had your Illinois
17  broker's license?
18  A. I think since 1981.
19  Q. Have you maintained that license
20  consecutively at least through the years 2007,
21  '08, and '09?
22  A. Yes.
23  Q. As part of your license, are you allowed
24  to sell Worker's Compensation insurance?

Page 9

1  A. Yes.
2  Q. Generally describe to me the types of
3  services B.D. McClure & Associates provides, just
4  kind of an overview?
5  A. B.D. McClure is the sales wing. We go
6  out and do what any broker does. We sell
7  premiums, you know, contracts with the insurance
8  carriers guaranteeing claims will be paid for, you
9  know, the policy period, which is a 365 day
10  period.
11  We take a look at -- premiums are
12  typically based on losses, so we will take a look
13  at claims of -- five-year claims history of where
14  an insured was. We will determine where the
15  frequency and severity is in a risk. We will
16  determine how they can be -- best help themselves,
17  whether that's by instituting post offer for
18  higher work or testing for employees, post offer
19  for prior testing or return to work programs for
20  the Worker's Compensation to mitigate exposure to
21  developing a medical provider that takes a look at
22  the occupational risk, not the family medical type
23  approach to claims, and really we do an entire
24  educational process with our insureds allowing

3  (Pages 6 to 9)

## Page 10

1  them to understand that for every claims dollar
2  that they will spend, it's going to cost them more
3  money, so our goal is to mitigate exposure.
4      Q.  What types of insurance products do you
5  sell to your clients?
6      A.  Worker's Compensation, general
7  liability, property, auto, umbrellas,
8  comprehensive commercial insurance packages or
9  coverages, D & O coverage, professional liability.
10     Q.  Do you sell any homeowners insurance?
11     A.  We have one agent that does.
12     Q.  How many employees does McClure employ?
13     A.  Three.
14     Q.  What are their names?
15     A.  Barb Gast.
16     Q.  Is that G-a-s-t?
17     A.  G-a-s-t.  Barb Burtelson,
18  B-u-r-t-e-l-s-o-n.  We just hired a new employee
19  Tammy.  I would have to go look at the last check
20  to tell you her last name because we just hired
21  her a couple weeks ago.
22     Q.  That's fine.  Generally, could you
23  please describe to me what each of those
24  individuals do for McClure.

## Page 11

1      A.  Barb Gast is the bookkeeper in charge of
2  the agency operations.
3          Tammy is at the front desk.  She
4  answers the phone and is in charge of mail and in
5  charge of learning other responsibilities in the
6  agency.
7          Barb Burtelson primarily works with
8  claims.
9      Q.  How long has Barb Gast been with you?
10     A.  17 years.
11     Q.  How about Barb Burtelson?
12     A.  17 years.
13     Q.  And Tammy just recently?
14     A.  Just recently.
15     Q.  Would you say within the last year --
16  how about the last six months?
17     A.  Last month.
18     Q.  Are you the sole owner of B.D. McClure &
19  Associates?
20     A.  Yes.
21     Q.  Does anyone else have a financial
22  condition in the business?
23     A.  No.  B.D. McClure & Associates has a
24  partnership arrangement with Brimar

## Page 12

1  Investigations, two separately-owned companies,
2  and we have a partnership agreement between those
3  entities.
4      Q.  Is Brimar a general partner, or is B.D.
5  McClure a general partner in the partnership, or
6  do you know which one is which?
7      A.  There is no general partner.
8      Q.  Do you both have equal interest in the
9  partnership?
10     A.  Yes.
11     Q.  First of all, you said Brimar is one of
12  the partners in the partnership, correct?
13     A.  Brimar Investigations, Ltd is owned by
14  Dave Ciarrachi.  They are a partnership with B.D.
15  McClure & Associates.  It becomes McClure &
16  Ciarrachi.
17         B.D. McClure & Ciarrachi.  That's a
18  funnel account that we have.
19     Q.  What's the purpose of that partnership?
20     A.  Brimar is a claims administration and
21  adjusting company, and B.D. McClure & Associates
22  is an insurance agency.
23     Q.  Is Brimar and B.D. McClure the only two
24  entities that are involved in that partnership?

## Page 13

1      A.  Yes.
2      Q.  Is Brimar Investigations, Ltd Brimar
3  Claims Administrative Company?
4      A.  Yes.  Brimar Investigations, Ltd is the
5  company.  I don't know who Brimar Administration
6  Claims Company is.
7      Q.  Have you ever heard of that company
8  name?
9      A.  People maybe refer to it as that but --
10     Q.  To your knowledge, that's the correct
11  legal entity name?
12     A.  No.
13     Q.  Who's your primary contact at Brimar?
14     A.  Dave Ciarrachi.
15     Q.  Did B.D. McClure & Associates work with
16  Brimar in connection with any of the insurance
17  produced or procured through AEG?
18     A.  I don't know that we work with Brimar.
19  Brimar was handling some claims for AEG.
20     Q.  How long have you -- Brimar and McClure
21  been partners?
22     A.  Since 1985.
23     Q.  Is that about how long you have known
24  Ciarrachi?

Page 14

1    A.  No.  I have known him longer than that.
2    Q.  Do you know how long you have known him?
3    A.  1982, probably.
4    Q.  Mr. Ciarrachi does not have any
5  financial ownership in McClure & Associates?
6    A.  No.
7    Q.  Obviously, the purpose of this lawsuit
8  deals with the insurance produced through AEG.
9  You're familiar with that, correct?
10   A.  Yes.
11   Q.  When did McClure start offering
12 insurance products for AEG?  Whenever I say AIG, I
13 mean AEG.  It's simply a slip-up.
14      MR. SCOLARO:  Can you repeat the
15 question?
16 BY MR. RICE:
17   Q.  When did you start soliciting or
18 offering for sale Worker's Comp insurance offered
19 or administered by AEG?
20   A.  In late 2005.
21   Q.  How long do you think you sold AEG
22 products?
23   A.  Repeat that question.
24   Q.  You started in about late 2005.  How

Page 15

1  long did you sell insurance administered with
2  AEG?
3    A.  We sold the products until we discovered
4  that there may be a problem with the AEG program,
5  which was -- I believe it was in 2007, the first
6  part of the year in 2007, maybe May of 2007,
7  something like that, if my memory serves me
8  correctly.
9    Q.  I believe -- Are you aware that McClure
10 has filed a counterclaim against American
11 Automobile in the federal lawsuit?  Are you aware
12 of that?
13   A.  Yes.
14   Q.  I believe in your counterclaim you had
15 indicated that you had sold the product up until
16 about July of 2007.  Does that sound accurate?
17   A.  No, because in July of 2007 was when we
18 brought Dallas National on board, July 25th of
19 '07, to be specific, to take over all the
20 accounts.  I believe that AEG was liquidated a
21 month before, two months before, probably a month
22 before.  Sometime in July they were liquidated.
23 There was no company, and we stopped selling
24 through AEG quite sometime before and stopped

Page 16

1  paying them premium too.
2    Q.  You had said you brought in Dallas
3  National.  Who's that?
4    A.  Dallas National is a B-plus rated
5  carrier from Dallas, Texas.
6    Q.  When you say you brought them in, you
7  brought them in to fill the void for offering
8  Worker's Compensation insurance policies?
9    A.  We actually had a meeting in Springfield
10 with Eddie McCreety (Phonetic), the Department of
11 Insurance.  We brought them in at that time.  We
12 got -- They were not licensed in the State of
13 Illinois.  We got them approved within five or
14 six days.  They agreed to take over all of the
15 accounts that we had written through AEG as of
16 December 25, 2007.
17   Q.  When you say they were willing to take
18 them over, do you mean that they would start a new
19 policy term with the inception of the date when
20 the AEG policy expired?
21   A.  No.  As of July 25, 2007 they started
22 writing the insurance through to the expiration
23 date, and then they would renew it.
24   Q.  So they were not going to take over or

Page 17

1  assume the liability that AEG had prior to July
2  25th of '07?
3    A.  No.
4    Q.  Did you have any contacts at AEG
5  directly?
6    A.  Just with Mike Ward.
7    Q.  Who's Mike Ward?
8    A.  Mike Ward was the president and CEO of
9  AEG.
10   Q.  How did you meet Mr. Ward?
11   A.  He was introduced to me by two of the
12 producers that work here that were handling claims
13 for AEG.
14   Q.  When you say "work here," where?
15   A.  They work -- They are independent
16 producers that work with McClure & Associates.
17   Q.  About how many different insurance
18 companies do you write business for?
19   A.  Seven.
20   Q.  Are you captive agents for those
21 insurance companies?
22   A.  I am not sure what you mean by captive
23 agents.
24   Q.  Are you the only agent that is allowed

5  (Pages 14 to 17)

Page 18

1　to write business for that particular insurance
2　company in Illinois?
3　　A. No.
4　　Q. Are you able to obviously then write not
5　only for that insurance company but the six other
6　ones you represent?
7　　A. Yes.
8　　Q. So your agency agreements, do you have
9　agency agreements with all of these insurers?
10　　A. Yes.
11　　Q. These agreements are obviously to write
12　policies for other insurers also?
13　　A. Yes.
14　　Q. Did you have an agency agreement with
15　AEG?
16　　A. Verbal.
17　　Q. Verbal agreement? Was that agreement
18　directly with AEG? I believe there is another
19　Reinsurance Company of America. First of
20　all, was the agreement with AEG verbally?
21　　A. Yes.
22　　Q. Did you have a separate agreement with
23　RCA?
24　　A. I actually had a contract with RCA at

Page 19

1　one point.
2　　Q. I think the dates we kind of talked
3　about, earlier date 2005 to May-ish, June-ish of
4　2007. Is it fair to say that was 29-year window,
5　approximating, that you sold AEG insurance?
6　　A. Give me the approximate window again.
7　　Q. I believe we used late 2005 is when you
8　first started the business?
9　　A. Correct.
10　　Q. You stopped mid-2007, certainly sometime
11　before July?
12　　A. It was before May, I think. We stopped
13　selling for AEG, and I can't remember the exact
14　date, but I could find by the last account that I
15　wrote with them because when I did figure that I
16　had a problem with AEG maybe taking money, I paid
17　$5000 to a consultant through my law firm to get a
18　meeting with a director of insurance, told him
19　that I thought we had a big problem.
20　　Q. Again for purposes of this discussion,
21　I'm just going to refer to it as a two-year window
22　of time that you sold insurance for them, maybe a
23　little less. I understand that. During that
24　time period, approximately how many clients did

Page 20

1　you place business with with AEG?
2　　A. You know, I don't have the list in front
3　of me. I don't know whether it was 15 or 20, 30
4　clients. I am not sure how many.
5　　Q. Do you have a list of those clients?
6　　A. There is a list somewhere of the exact
7　numbers of clients, yes.
8　　Q. Who would have that list?
9　　A. Barb Gast would probably have that.
10　　MR. RICE: I think we had asked for that
11　before in the course of discovery, so I will make
12　a request on the record. If you could work with
13　Brian to try to get a copy of that list, that
14　would be helpful.
15　　MR. SCOLARO: Sure.
16　　Take a break for a second.
17　　MR. RICE: Sure, no problem.
18　　(Break had.)
19　BY MR. RICE:
20　　Q. For purposes of our discussion here, I
21　think in your counterclaim against American
22　Automobile the number was 25, approximately 25, so
23　we will use that figure. That certainly fits
24　within the range you gave us.

Page 21

1　　A. Right.
2　　Q. Let's assume for the sake of argument
3　it's 25 clients. It's fair to say that all 25 of
4　those clients' business were written during that
5　same two-year time period we talked about earlier,
6　correct?
7　　A. Yes.
8　　Q. Approximately how many of those clients
9　were transferred over to Dallas National?
10　　A. 100 percent.
11　　Q. Did you know if any of those or all of
12　those clients are still clients of Dallas
13　National?
14　　A. There are a couple clients that are no
15　longer with Dallas National, that I know of.
16　　Q. Now, during that two-year window you
17　were selling AEG Insurance, did you ever sell any
18　other Worker's Compensation policies offered from
19　different carriers?
20　　A. Yes.
21　　Q. Approximately how many other carriers
22　did you work with? I think you said seven offered
23　Worker's Comp policies?
24　　A. All seven of them, probably.

6　(Pages 18 to 21)

Page 22

1    Q.  Aside from the 25 or so clients you
2  placed with AEG, did you have other clients from
3  McClure that placed Worker's Comp business with
4  other insurer?
5    A.  Yes.
6    Q.  Just generally, when did you decide to
7  place insurance with AEG perhaps versus another
8  carrier that you were also servicing?
9    MR. SCOLARO:  Objection.  Form, but you
10  can answer the question if you understand it.
11  BY MR. RICE:
12    Q.  I can try to rephrase the question if
13  you would like.
14    A.  Please rephrase.
15    Q.  If a client came to you and said, "I
16  want to purchase Worker's Compensation insurance,"
17  could you describe to me the process you would go
18  by -- you would use to decide which carrier to
19  place that business with?
20    A.  We take a look at the risk.  We see what
21  the risk tolerance was of the carriers.  If it was
22  something that was up AEG's alley -- because
23  certain carriers have tolerance for different
24  types of risks, and we place it based on the risk

Page 23

1  tolerance of the carrier.
2    Q.  Do you know whether AEG had a typical
3  type of risk that they would insure?
4    A.  They insured tougher types of risks.
5    Q.  By "tougher" what do you mean?
6    A.  We insured taxi cabs in the City of
7  Chicago.  We insured fire districts.  We still
8  have those programs.   They are very profitable.
9    Q.  When you were introduced to AEG back in
10  late 2005, did you perform any investigation into
11  the company generally just to learn about them?
12    A.  Yes, we did.
13    Q.  What type of investigation did you do?
14    A.  First thing we did we asked for a copy
15  of their agreement with RCA.  We found out that
16  RCA was the reinsurance carrier.  We saw that
17  they had a million dollar deductible.  They paid
18  the first million dollars.
19    We contacted the Department of
20  Insurance.  We asked them if AEG had ever been in
21  trouble with the Department of Insurance as a
22  licensed PEO for not paying claims.
23    We looked at the Reinsurance
24  Corporation of America rating and found that it

Page 24

1  was, I think, an A minus or an A.  They had been
2  around for 25 years, and we were familiar with
3  them because we had a contract with them.  With
4  Mike Ward he could sell some things that RCA
5  wouldn't write for us because of his million
6  dollars doubling the plan that he had with them.
7    He paid the claims; and that he had a
8  15 percent loss ratio with them, and so we did all
9  the due diligence that you would on any company.
10  It was the first PEO that we had ever heard of,
11  but we understood the concept of reinsurance.  We
12  knew that if anything happened to AEG that RCA was
13  on the policy.
14    Q.  Did you understand RCA to be on the
15  policy after the million dollars was expended by
16  AEG or they would drop down to cover the AEG?
17    A.  They would drop down if anything
18  happened to AEG. That's the way that policy works.
19    Q.  You said at that time did you also have
20  that contract with RCA?
21    A.  Yes.
22    Q.  The separate agreement between McClure
23  and RCA?
24    A.  Yes.

Page 25

1    Q.  What did that agreement entail?
2    A.  That was an agency contract direct.
3    Q.  So that allowed you to write business
4  for RCA directly?
5    A.  Yes.  We had originally found RCA
6  through a MGA, managing general agent, named
7  American Patriot.  They are a large writer of
8  roofing business, and the now president of that
9  organization, Mike Shook, came in, one of our
10  agents brought him in, and he told us that he
11  represented a market that could write tougher
12  classes of business, so we started writing through
13  them.
14    Ultimately within maybe six or seven
15  months RCA closed that agency down.  RCA came to
16  us because we had the most profitable business
17  that we had written in Illinois and asked us if we
18  wanted to have a contract, and we said yes.  So
19  we developed a contract with them at that time.
20    Q.  So your relationship with RCA was
21  separate and distinct prior to learning about
22  AEG's business?
23    A.  Exactly.
24    Q.  So it was just by happenstance that RCA

24 Seven Discovere
(312) 704-0247

Page 26

1 actually reinsured AEG at the time you learned
2 about AEG?
3    A.  That's how we first heard of the
4 whole -- right.  Ward happened in here.  Two of
5 the guys that used to work for Freemont Insurance
6 Company who had been in claims who are producers
7 now were handling claims.  They had Mike Ward as a
8 risk manager of a large staffing company that they
9 wanted to quote on when warned them that he owned
10 this PEO.  He was a consultant in the staffing
11 company.  If they would handle some claims, he
12 would get involved in, quote, that insurance and
13 that was how Mike Ward even got in the door.
14 Ultimately it was everyone coming to me saying
15 Mike said he could do it, so I sat down and
16 listened to what he had to say.
17    Q.  I think you had mentioned that one of
18 your agents had introduced you to RCA?
19    A.  Yes, one of the agents had introduced us
20 to Mike Shook, the MGA, who ultimately represented
21 RCA in Illinois, and so we would go through
22 American Patriot to place insurance, and we did
23 place insurance through that MGA.  We didn't do it
24 directly at first.

Page 27

1    Q.  How many agents would you say you work
2 with to solicit business for McClure?
3    A.  Seven.
4    Q.  Where are those agents located?  Are
5 they all over?
6    A.  Right here.
7    Q.  When you say "right here," they are
8 physically out of this office?
9    A.  Uh-huh.
10    Q.  They are not employees of McClure &
11 Associates?
12    A.  No.
13    Q.  You have separate agreements with each
14 one of them?
15    A.  Yes.
16    Q.  Are those written contract agreements?
17    A.  Yes.
18    Q.  Are those renewed annually, or are they
19 just ongoing until you terminate them?
20    A.  Ongoing until terminate, either way.
21    Q.  Do those agents exclusively work with
22 McClure & Associates?
23    A.  No.
24    Q.  So they don't work with any brokers?

Page 28

1    A.  No.
2    Q.  You had indicated that AEG was your
3 first experience with the PEO?
4    A.  Yes.
5    Q.  None of the other insurance companies
6 you currently work for are PEOs, correct?
7    A.  No.
8    Q.  When you sold insurance to any of the 25
9 clients through AEG, were they aware this was a
10 PEO or traditional insurance company?
11    A.  Yes, except the State of Illinois allows
12 for a PEO to sell just single line items.  They
13 can break out Worker's Compensation, so while they
14 were familiar with it, PEO through RCA, RCA was
15 the carrier.  It was a stand alone Worker's
16 Compensation program with their own certificates
17 directly from RCA, so RCA was the carrier.
18    Q.  I am going to show you what's been
19 marked as Exhibit No. 1 for your deposition.  If
20 you take a second just to flip through that, do
21 you recognize that document?
22    A.  No.
23    Q.  If you take a look at Pages 8 and 10 of
24 the actual document, not the numbers in the bottom

Page 29

1 right-hand corner, is that your signature on those
2 documents?
3    A.  Yes.
4    Q.  I believe this to be the agency
5 agreement you were referring to between McClure &
6 Associates and American Automobile Insurance
7 Company of America.  Do you believe that to be
8 true?
9    A.  Yes.  It looks like the agency
10 agreement.
11    Q.  We had talked previously McClure &
12 Associates written as an agency that agreement
13 with RCA.  Is this that agreement?
14       MR. SCOLARO:  It calls for a legal
15 conclusion.  To the extent he has to read through
16 the whole thing and see if, in fact, it's the same
17 one that was his, but he can answer to the extent
18 he recognizes it as that document.
19       THE WITNESS:  What was the question?
20 BY MR. RICE:
21    Q.  I am just curious to know whether this
22 is the agreement you were referring to earlier
23 between McClure & Associates and RCA?
24    A.  It looks like it.

8  (Pages 26 to 29)

Page 30

1  Q. Can McClure & Associates execute any
2  other agreements with RCA other than the one you
3  had mentioned before?
4  A. No.
5  Q. Is this agreement still in effect
6  between McClure & Associates and RCA?
7  A. No.
8  Q. When did you terminate your relationship
9  with RCA?
10  A. I don't recall when.
11  Q. Was it after the AEG liquidation?
12  A. Before.
13  Q. At any point were you selling AEG
14  insurance?
15  MR. SCOLARO: Objection. Form. To the
16  extent you understand the question, go ahead and
17  answer.
18  MR. RICE: I haven't even finished my
19  question.
20  MR. SCOLARO: I thought you were done.
21  MR. RICE: I was trying to look for the
22  words.
23  MR. SCOLARO: All right.
24

Page 31

1  BY MR. RICE:
2  Q. Are you still selling AEG insurance
3  after you terminated your relationship with RCA?
4  A. I never terminated my association with
5  RCA.
6  Q. Did RCA terminate the relationship with
7  McClure & Associates?
8  A. Yes, they did.
9  Q. Do you know why they did that?
10  A. They were in a lawsuit with AEG, they
11  told me.
12  Q. Did they give you any indication that
13  their decision to terminate the relationship with
14  you had anything to do with what McClure &
15  Associates was doing with respect to their
16  products?
17  A. No. They said it all had to do with the
18  legal battle they were in with AEG over coverage
19  and premiums.
20  Q. Because AEG was a PEO; they have A best
21  rating?
22  A. No.
23  Q. You indicated that when you're
24  investigating AEG, you did locate RCA AM best

Page 32

1  rating?
2  A. Yes.
3  Q. What was their rating at that time?
4  A. It was an A minus or better.
5  Q. How did you determine that?
6  A. By looking at the internet and looking
7  at Best.
8  Q. So you used Best Internet Guide?
9  A. Correct.
10  Q. You don't have the physical books
11  themselves?
12  A. No.
13  Q. Would you have checked that rating in
14  2005, late 2005, when AEG was presented to you as
15  a potential insurer?
16  A. We did before, yes, before we ever
17  started selling, yes.
18  Q. So just I am clear, you would have
19  checked RCA's rating prior to selling any AEG
20  insurance?
21  A. Yes.
22  Q. Did you continually check RCA's rating
23  during the course of that two-year period you were
24  selling AEG insurance?

Page 33

1  A. I don't continually check any carrier's
2  rating.
3  Q. So is it fair to say that you checked
4  the first time at the inception of your selling
5  these insurance policies?
6  A. I checked several times, but I don't
7  essentially do it on a habitual basis.
8  Q. Do you do it once a year?
9  A. From time to time. We might do it twice
10  a year.
11  Q. What would provoke you to check it?
12  A. When our insured's asking me what our
13  rating was.
14  Q. It's not as though every six months to
15  check just to check?
16  A. No.
17  Q. Do you print off the rating when you
18  check?
19  A. Yes.
20  Q. Did you do that in this instance?
21  A. Yes.
22  Q. Where would you store that rating
23  printout?
24  A. We would give it to the insured.

Page 34

1    Q. Do each of the 25 clients that you place
2  the AEG -- Strike that.
3        Does McClure keep a file for each of
4  its clients?
5    A. Yes.
6    Q. Is that also true for the 25 clients you
7  placed with AEG?
8    A. Yes.
9    Q. Do you still have those files?
10   A. I would guess.
11   Q. Is that something you can check?
12   A. I would have to see if they were purged
13 by our office manager or not back in '05. I
14 don't know.
15   Q. Are any of the 25 clients that you
16 placed with AEG still clients of the company?
17   A. Yes.
18   Q. Do clients have one file per client or
19 multiple files depending on what types of
20 insurance they have?
21   A. Multiple files for each year for each
22 line of coverage.
23   Q. What is your document retention policy?
24   A. Typically, four years.

Page 35

1    Q. Do you have one in writing, or is it
2  your document retention program in writing?
3    A. No.
4    Q. To the extent that all of the 25 clients
5  that you placed with AEG are still clients, you
6  will have a file for them in some capacity or
7  other?
8    A. Correct.
9    Q. It becomes a matter of whether or not
10 the information back in 2005 is still in the file?
11   A. Right.
12   Q. Do you keep any electronic copies of
13 your files?
14   A. No.
15   Q. Is any portion of the file kept
16 electronically?
17   A. No, other than billing.
18   Q. What goes into a client's file here at
19 McClure & Associates?
20   A. Typically policies, underwriting.
21   Q. How about correspondences between the
22 client and McClure & Associates?
23   A. If it's pertinent. Additions, deletions.
24   Q. How about documents relating to claims?

Page 36

1    A. Typically we don't keep that information
2  because it changes.
3    Q. What do you mean by "it changes"?
4    A. The claims loss runs.
5    Q. So if --
6    A. Claims are handled by insurance
7  carriers.
8    Q. If someone were to report a claim, is it
9  possible that they might call McClure & Associates
10 first?
11   A. Yes.
12   Q. If that would happen, what would you do?
13   A. Report it to the carrier.
14   Q. Then would it be the intention that the
15 carrier would pick up from that point and handle
16 the administration of the claims?
17   A. Depends. Administering the claim.
18   Q. Did you, McClure & Associates,
19 administer a lot of claims back in 2005 through
20 2007?
21   A. McClure & Associates never has
22 administered a claim.
23   Q. Do you do that today?
24   A. McClure & Associates doesn't do that.

Page 37

1    Q. Who does?
2    A. Brimar.
3    Q. Do you know whether Brimar maintains
4  claims information for claims made by McClure &
5  Associates clients?
6    A. What dates?
7    Q. Well, currently.
8    A. If it's controlled by Brimar or
9  controlled by the insurance company?
10   Q. We will do both. Are there situations
11 where Brimar acts as the claims administrator for
12 a claim for an insurance company?
13   A. Yes.
14   Q. Are there certain carriers that Brimar
15 simply is a conduit between McClure & Associates
16 and the insurer?
17   A. Yes.
18   Q. In those latter instances the insurance
19 company would administer the claim?
20   A. Correct.
21   Q. In those instances where Brimar is
22 acting as the claims administrator, do you believe
23 that they have claims files for those claims?
24   A. Yes.

Page 38

1    Q. Do you believe that that was the policy
2 back in 2005 through 2007?
3    A. Yes.
4    Q. Did Brimar act as a claims administrator
5 for claims made involving AEG insurance policies?
6    A. Yes.
7    Q. Do you believe that they maintain claims
8 files for those claims?
9    A. Yes.
10    Q. Do you have copies of their claims
11 files?
12    A. Yes.
13    Q. Are those stored here at your office?
14    A. Yes.
15    Q. Because AEG was a PEO did you ever
16 expect the Illinois Guarantee Fund would step in
17 in the event AEG became insolvent?
18    A. Yes.
19    Q. Why do you believe that?
20    A. RCA is a licensed carrier in good
21 standing with the State of Illinois.
22    Q. You believe that the Guaranteed Fund
23 would step in despite the fact that AEG was
24 responsible for the first million dollars of

Page 39

1 coverage directly?
2    A. Absolutely.
3    Q. Have you ever spoke to the Guarantee
4 Fund about these claims?
5    A. Not personally.
6    Q. Has the guaranteed fund ever written you
7 any correspondence to indicate that they do not
8 insure or will not step down in light of the AEG
9 insolvency?
10    A. I don't recall receiving anything from
11 the Guarantee Fund.
12    Q. Do you know whether AEG participated in
13 the Guarantee Fund?
14    A. I don't know.
15    Q. Did you ever investigate that?
16    A. I never thought about it.
17    Q. Do you know whether RCA participated in
18 the Guarantee Fund?
19    A. Yes, they do.
20    Q. We talked back -- I think you had
21 mentioned again May, June of '07 you became aware
22 that there was a big problem with AEG, correct?
23    A. Uh-huh. Actually, it wasn't with AEG.
24 It was RCA.

Page 40

1    Q. Could you describe to me what you
2 learned back then?
3    A. There was an investigator that came in
4 from the Department of Insurance Consultant, and
5 he was taking a look at RCA.
6    Q. What was he investigating or she
7 investigating?
8    A. He was investigating James Kernan, the
9 President and CEO of RCA.
10    Q. Did you have a discussion with the
11 investigator about RCA?
12    A. Tried to.
13    Q. What do you mean you "tried to"?
14    A. He wasn't too cooperative. He was more
15 interested in gaining information.
16    Q. So he asked a lot of questions but
17 wouldn't give a lot of answers, is that fair?
18    A. Correct.
19    Q. Did the investigator come here just that
20 one time?
21    A. Yes.
22    Q. Do you recall when approximately that
23 was?
24    A. It was in '07. I contacted my

Page 41

1 attorney. He came in. Took over from there.
2    Q. When the investigator came to your
3 office and advised you that they were
4 investigating RCA, why did that concern you with
5 respect to AEG?
6    A. Because he told us that there was
7 potential for fraud between RCA and a number of
8 companies that they had sold deductible policies
9 or alleged they they sold deductible policies that
10 they hadn't filed for.
11    Q. Your concern was AEG may fall into that
12 category of policies that were assumed in this
13 potential fraud?
14    A. Yes.
15    Q. Again, do you recall approximately the
16 month?
17    A. Sometime in '07.
18    Q. First half of '07?
19    A. First half of '07.
20    Q. Are you aware that the Department of
21 Insurance had issued a cease and desist order with
22 respect to the placement of insurance with AEG?
23    A. They did that directly -- gave it
24 directly to me. I actually was instrumental in

11 (Pages 38 to 41)

Page 42

1  getting that done because I brought that to the
2  Department of Insurance's attention when I found
3  out that there was a problem potentially with RCA.
4      Q.  I believe that order was entered on July
5  5th of 2007.  Does that sound accurate to you?
6      A.  Yes.
7      Q.  Is it fair to say that the investigator
8  you spoke about or spoke with concerning RCA, that
9  conversation took place before the cease and
10  desist order was entered?
11     A.  Months before.
12     Q.  So going back to the question of when
13  did that investigator come out and speak with you,
14  it's probably sometime in May and June of '07?
15         MR. SCOLARO:  Objection.  Asked and
16  answered, but to the extent --
17         THE WITNESS:  Sometime in the first half
18  of the year.  It was months before because -- and
19  the reason I have told you that, I didn't pay -- I
20  stopped writing insurance with AEG because I set
21  the meeting with the Department of Insurance to
22  tell them that I thought there was a problem, and
23  then we ended up keeping $1.3 million in the
24  premium trust fund, not sending the money out.

Page 43

1         The statement the Department of
2  Insurance was telling us to use some of those
3  funds to pay the claims, ongoing claims, that we
4  had.  Inside all of this -- I can't remember the
5  time frames -- but the Department of Insurance was
6  well aware of what was going on.  They knew we had
7  the money.  They would approve payments to
8  claimant's ongoing until they stopped that and
9  said hold the money, and then they took the money
10  after the liquidation.
11  BY MR. RICE:
12     Q.  From the time in which you met with the
13  investigator until the time the cease and desist
14  order was entered, did you issue any AEG insurance
15  policies during that time period?
16         MR. GORBOLD:  Could I hear that question
17  again?
18         (Record read.)
19         THE WITNESS:  To the best of my
20  knowledge, no.
21  BY MR. RICE:
22     Q.  I believe you indicate earlier that you
23  have or could create a list of clients whom you
24  issued AEG insurance with, correct?

Page 44

1      A.  Correct.
2      Q.  Would that list also contain when those
3  policies were issued?
4      A.  Yes.
5      Q.  I am showing you what's been marked as
6  Exhibit 2 for your deposition.  Could you take a
7  moment to look that over?
8      A.  Uh-huh.
9      Q.  Let me know when you're finished.  Do
10  you recognize this letter?
11     A.  Yes.
12     Q.  Did you receive this letter?
13     A.  Yes.
14     Q.  When approximately did you receive it?
15     A.  I don't recall.
16     Q.  Do you recognize the signature at the
17  bottom of the letter?
18     A.  It says Michael Ward, but I don't know
19  if that's his signature or not because I don't
20  know what his signature looks like.
21     Q.  I notice this letter isn't addressed or
22  dated.  Do you know whom this letter was sent to?
23     A.  No.
24     Q.  You do know, however, you got a copy of

Page 45

1  it?
2      A.  I don't know if I did or didn't.
3      Q.  So you don't have any idea what time
4  frame you would have received it?
5      A.  No.
6      Q.  Of the 25 clients you placed AEG
7  insurance with, approximately how many have
8  submitted claims to McClure & Associates for
9  Worker's Comp benefits?
10     A.  My guess is probably all 25.
11     Q.  So all 25, to the best of your
12  knowledge, have submitted a claim because one of
13  their employees has been injured?
14         MR. SCOLARO:  Objection.  Asked and
15  answered, but to the extent you know the answer to
16  the question, you may answer it.
17         THE WITNESS:  You know, I don't have
18  that information in front of me, so I really can't
19  say; but, you know, typically there might be one
20  or two accounts that don't have any claims at all,
21  maybe three -- I don't know -- but the majority of
22  clients have claims.
23  BY MR. MCCLURE:
24     Q.  Because McClure & Associates does not

Page 46

1 administer those claims, do you have any records
2 of them here at your office?
3 MR. SCOLARO: Objection. Form, but to
4 the extent you understand what "them" means, you
5 can answer the question.
6 THE WITNESS: Why don't you ask in a
7 way --
8 BY MR. RICE:
9 Q. I can rephrase the question. You had
10 mentioned that McClure & Associates does not
11 administer claims, correct?
12 A. Correct.
13 Q. Do you have copies of any claims files
14 relating to any of these claims made by these 25
15 clients for Worker's Comp claims?
16 A. Brimar does.
17 Q. You also have a copy of Brimar files?
18 A. No.
19 Q. You do not?
20 A. I don't keep copies of Brimar files.
21 Brimar keeps copies of those files.
22 Q. I thought you had said earlier Brimar --
23 A. Involve claim files? They are in this
24 office, but those are Brimar claims files.

Page 47

1 Q. Brimar shares an office with you?
2 A. Yes.
3 Q. They share the same 2067 or 2077?
4 A. I don't know what -- they are 2067.
5 Q. They share the same address?
6 A. Same address.
7 Q. Do you recall when the first claim was
8 ever made by a claimant --
9 A. No.
10 Q. -- involving -- when the first claim was
11 ever made by one of the 25 clients relating to an
12 AEG policy?
13 A. No.
14 Q. Would Brimar have that information?
15 A. They would have the claims files. I
16 don't know if they would list when the first claim
17 happened is.
18 Q. When the first claim was made, whenever
19 it was made, did you have a discussion with anyone
20 from Brimar about that claim?
21 A. I didn't discuss claims with Brimar.
22 Q. Did Brimar make you aware that a claim
23 had been made?
24 A. They don't make me aware that claims are

Page 48

1 made. The only thing we talk about are loss
2 ratio premium to claims.
3 Q. Did any of your clients ever contact
4 McClure & Associates to report a claim? In that
5 event did you just transfer to Brimar?
6 A. Well, they didn't contact me, but they
7 would have called our number and probably would
8 have been transferred to Brimar, yes.
9 Q. How many employees does Brimar have?
10 A. The claim, three that I do.
11 Q. In addition to the three staff members
12 that you share, do they have anybody else working
13 for them besides Mr. Ciarrachi?
14 A. There are some producers that
15 administered claims for AEG for a fee per claim,
16 and they worked on Brimar's behalf as independent
17 contractors.
18 Q. Did you have any involvement in the
19 decision to pay claims directly for AEG insureds?
20 MR. SCOLARO: Objection. Foundation,
21 but to the extent you understand the question, you
22 may answer it.
23 THE WITNESS: Can you repeat the
24 question.

Page 49

1 BY MR. RICE:
2 Q. Sure. You said that you were not
3 involved or McClure & Associates was not involved
4 in the claims process for AEG, correct?
5 A. Correct.
6 Q. Did you have any involvement in the
7 decision to pay claims directly for claims made by
8 insureds that had AEG insurance?
9 A. When?
10 Q. From 2005 to 2007.
11 A. As a claims administrator? Mike Ward
12 hired Brimar to handle his claims. He didn't
13 hire McClure & Associates. He hired Brimar, so
14 that was a relationship between AEG and Brimar.
15 It had nothing to do with me.
16 Q. Is that also true post 2007 to the
17 present?
18 A. Explain that to me.
19 Q. My question to you is --
20 MR. SCOLARO: After his question I
21 would like to take a break.
22 BY MR. RICE:
23 Q. We are going to get into it in a little
24 bit. I think you had mentioned it already that

Page 50

1    some of the premium money, the $1.3 million had
2    been used to pay claims directly to people who had
3    AEG insurance, is that correct?
4        A.   Correct.
5        Q.   All I want to know is now did you have
6    any involvement in the decision to pay claims?
7        A.   To mitigate the damages, yes.
8        MR. SCOLARO:   Can I take a quick break.
9        MR. RICE:   Sure.
10        (Break had.)
11   BY MR. RICE:
12       Q.   You had indicated before we want on a
13   break that you had been involved in some of the
14   decision making in terms of payments of some of
15   these claims made by AEG insureds, is that
16   correct?
17       A.   Yes.
18       Q.   When checks or money was ever paid, were
19   those funds paid by McClure & Associates or
20   Brimar?
21       A.   They were paid by McClure & Associates
22   or Ciarrachi.
23       Q.   The partnership?
24       A.   Correct.  This is post AEG liquidation.

Page 51

1        Q.   Do you know whether any claims were paid
2    directly by McClure and Ciarrachi prior to AEG
3    liquidation?
4        MR. SCOLARO:   Objection.  Foundation.
5    McClure & Ciarrachi, but to the extent you
6    understand the question, you can answer it.
7        THE WITNESS:  McClure & Ciarrachi didn't
8    pay any claims prior to inability to pay out of
9    the premium trust fund money that we have of our
10   clients.
11   BY MR. RICE:
12       Q.   Did Brimar make any payments prior to
13   AEG's inability to make the payments directly?
14       A.   AEG would give Brimar -- they were
15   funding the accounts to pay the claims, so Brimar
16   never paid a claim that wasn't paid by AEG.  AEG
17   would fund those accounts.
18       Q.   It was not until AEG was liquidated that
19   a decision had to be made how was the money going
20   to be paid or where was money going to come from?
21       A.   It was prior to liquidation.  It was
22   when AEG stopped funding the accounts, and I went
23   to the Department of Insurance and asked them for
24   the ability to pay claims based on the revenues

Page 52

1    that we had for our clients that we had an
2    agreement from them not to pay AEG.  The
3    Department of Insurance directed me what to do.
4    Don't pay AEG.  AEG at the same time was
5    threatening to cancel insurance on $6 million
6    worth of business, and the Department of Insurance
7    was apprised of that.  Everything was going on
8    because there had to be a solution for where that
9    insurance would go.
10       Q.   You have indicated you had approximately
11   $1.3 million of client premium trust money,
12   correct?
13       A.   Yes, that we had held.
14       Q.   Did you hold that because of the AEG
15   investigation or --
16       A.   Because the Department of Insurance was
17   trying to figure a way out of taking care of this
18   entire problem that they had been investigating
19   with AEG and RCA.
20       Q.   I am showing you what's been marked as
21   Group 3 for your deposition.  Take a moment just
22   to flip through those and review them and let me
23   know when you have had a chance to look through
24   them.

Page 53

1        A.   Okay.
2        Q.   Do you recognize these documents?
3        A.   Yes.
4        Q.   What are they?
5        A.   Claim documents into the liquidator.
6        Q.   Who would have prepared these documents?
7        A.   I'm not sure if the producers prepared
8    them or who prepared them.
9        Q.   If it wasn't the producers, who else
10   would it have been?
11       A.   Directly from the insureds.
12       Q.   I notice that on some of these
13   documents -- some of these pages of Group Exhibit
14   3 in the middle there is an amount of a claim.
15   Do you see that, middle right of the page?  There
16   is a box that has some handwritten notes in them?
17       A.   Yes.
18       Q.   On some of the pages they will show an
19   amount and then paid or no claim made.  Do you
20   see what I'm referring to?
21       A.   Yes.
22       Q.   Do you know who would have paid those
23   sums that are identified on these pages of Group
24   Exhibit 3?

**Page 54**

1    A. Possibly us. Possibly the insured.
2    Q. When you say "us," who do you mean?
3    A. Possibly Brimar or McClure & Ciarrachi,
4  either, or the insured if these were deductible
5  amounts.
6    Q. If you made these payments, you meaning
7  McClure Brimar --
8    A. McClure and Ciarrachi.
9    Q. -- do you have a way to keep track of
10 the amounts you paid?
11   A. Yes.
12   Q. Do you currently have a total of the
13 amounts you've paid?
14   A. I could total it.
15   Q. How is that information stored?
16   A. Checkbook register.
17   Q. So is that something you would be able
18 to gather and give to your attorney if I requested
19 it?
20   A. Yes.
21   Q. If McClure and Ciarrachi did not make
22 these payments, who else would have made them?
23   A. The insured.
24      Can I ask a question of my attorney

**Page 55**

1  here?
2    Q. Sure.
3    MR. SCOLARO: Off the record.
4    (Break had.)
5    MR. SCOLARO: I think my client -- We
6  would like to clarify an answer. I think if the
7  court reporter -- could the court reporter read it
8  back, please.
9    (Record read.)
10   MR. SCOLARO: If could you read back
11 that question, my client would like to clarify his
12 answer to that. Go ahead.
13   (Record read.)
14 BY MR. RICE:
15   Q. Who would have prepared these documents?
16   A. I don't know who prepared these
17 documents. Every document that was given to the
18 liquidator was signed by me, prepared by our
19 producers based on the claims dollars that were
20 paid on each claim. These particular forms
21 looked like they were sent out by the liquidator
22 directly to the insureds, and the insureds would
23 have filled this amount out directly, but these
24 are not the official forms because nothing is

**Page 56**

1  signed anywhere. This isn't an official form, so
2  I have all the official forms of everything that's
3  gone into the liquidator, and I have signed every
4  form because I paid for those claims.
5    Q. So just so I understand correctly, you
6  have forms that are somewhat similar to these
7  documents in Group Exhibit 3, but they have
8  certainly been authorized or signed by you and
9  they may contain slightly different information?
10   A. They contain a lot of different
11 information, and they are not only signed by me,
12 but it has all the documentation, supporting
13 documents.
14   Q. So medical records, whatever you need to
15 make the claim?
16   A. Everything that's needed to make a claim
17 has been given to the liquidator.
18   Q. Who would have that information now?
19   A. My attorney.
20   Q. When these forms in Group Exhibit 3 were
21 submitted to you or Brimar, who would be
22 responsible for going through the paperwork to
23 insure that these claims -- to determine whether
24 these claims should, in fact, be paid?

**Page 57**

1    MR. SCOLARO: Objection. Foundation.
2  But to the extent that that question reflects what
3  occurred, you may answer it.
4    THE WITNESS: Could you rephrase that
5  question?
6  BY MR. RICE:
7    Q. Sure. It sounded like to me -- I may
8  have misunderstood what you said earlier -- these
9  forms would have been submitted to either Brimar
10 or --
11   A. They were submitted to McClure &
12 Associates.
13   Q. Then McClure & Associates would have to
14 verify the information in these forms along with
15 the accompanying documentation, is that correct?
16   A. Correct.
17   Q. Then once you had verified that the
18 information you needed for the claim was there,
19 you would authorize these to be sent back to the
20 liquidator, correct?
21   A. The first thing that happened to even
22 get these sent in was that claims had to be paid,
23 and the first thing I did was I hired Austin
24 Resolutions to negotiate all of the outstanding

Page 58

1   medical bills.
2       Austin Resolutions out of Texas
3   closed out the outstanding medical probably at
4   twenty-five cents on the dollar for probably 90
5   percent of the medical, outstanding medical, on
6   the hundreds of claims that we had.
7       When Austin Resolutions would come
8   back with a signed contract, that contract was
9   allowing us to go back to the liquidator and
10  collect -- I had to have a signature for both, you
11  know, for this payment of dollars they agreed to
12  allow. I think it's Brimar to go back and go to
13  the liquidator for the money that they had been
14  paid or a percentage of, and so the only forms
15  that have been sent in are forms that have been
16  completed, claims closed, and it doesn't represent
17  all of the payments that we have made because any
18  payments that have been made through --
19      We have hired law firms to represent
20  clients and to close cases at the Commission. We
21  have paid for legal. We have paid for
22  settlements outside of anything that we have
23  turned into the liquidator.
24      Q. Based on what you have just told me, a

Page 59

1   lot has gone into the post AEG liquidation
2   handling and administration of claims that you
3   have obviously been involved in that process; is
4   that fair to say?
5       A. Yes.
6       Q. That's fair?
7       A. Yes.
8       Q. Because this is only a small portion of
9   the business you do on a day-to-day basis, have
10  you set up internally here within McClure &
11  Associates or Brimar a way to help facilitate that
12  sliver of your business in terms of handling and
13  processing these claims?
14      A. No.
15      Q. I should say obviously the reason why
16  these questions are relevant for purposes of this
17  discussion is you're obviously trying to collect
18  money from American Automobile to help reimburse
19  for payments you have made to these claimants, is
20  that correct?
21      A. You're the first person from American
22  Automobile to show up. I asked American
23  Automobile to show up two years ago to come in and
24  take a look at all of these claims to help to

Page 60

1   mitigate the exposure, to help cut the damages, to
2   help take care of the insureds that needed
3   coverage. American Automobile Insurance responded
4   zero, zero.
5       I had exposure, one case, one trial
6   case that I sent in to my carrier to actually see
7   if they would respond, Genie; and you know what
8   happened? I got sued on an account that I said I
9   will pay the $23,000 judgment that was given to me
10  when I was under an order to cease and desist. I
11  couldn't respond to anybody.
12      The attorney went back there and got
13  that hit with penalties for $100-some thousand of
14  which he is still trying to get, and suing my
15  insured; so, yeah, I have made decisions, lots of
16  decisions because I have no one to help me
17  mitigate.
18      I have taken the claims and mitigated
19  the exposure beyond the millions that I would have
20  had a plethora of lawsuits against me had I not
21  taken action; so, yes, you're the first person
22  from American Automobile Insurance that's come in
23  here, and you're taking my deposition, and no one
24  showed up. I have asked them many times to come

Page 61

1   in here and take a look at these claims files.
2       Q. Okay. I appreciate your statements.
3   I will ask my question again. You are looking to
4   recover money in this lawsuit for money that
5   either McClure & Ciarrachi or Brimar has paid out
6   directly to the claimants, correct?
7       A. Yes. That plus punitive damages by the
8   time I get done.
9       Q. What I'm asking you is: Is there a way
10  personally within McClure & Associates and Brimar
11  to calculate the amount of money that was paid out
12  directly to claimants?
13      A. Absolutely.
14      Q. Have you given that information to your
15  attorney?
16      A. Not the total amount yet.
17      Q. That is something you could calculate,
18  correct?
19      A. I could calculate that it's still
20  ongoing.
21      Q. I am going to ask on the record. I know
22  we asked it in discovery.
23      MR. SCOLARO: I think that part of my
24  client's point is that even when the first

16  (Pages 58 to 61)

Page 62

1  discovery was issued, that figure changes and can
2  change at any time. To the extent that we have
3  that current information, sure, it can be
4  provided.
5      MR. RICE: I also believe that we had
6  asked a list of the claimants because again one of
7  the purposes of the discovery was to assess the
8  amount of outstanding money that was paid to
9  justify one the amounts that's claimed in the
10  counterclaim; and, 2, the documentation to support
11  it so that we can obviously assess the risk; and,
12  2, know when these claims were made, when they
13  were paid, and obviously that's part of the entire
14  issue in the lawsuit, so to the extent that
15  documents have not been produced that were either
16  responsive to the -- again, I already heard about
17  claims documents that Brimar may have. They have
18  made copies.
19      THE WITNESS: We had 15 boxes of claims.
20  Anyone is welcome to come in here and take a look,
21  but I am not going to copy all that.
22      MR. SCOLARO: To the extent that there
23  was responsive documents at the time you issued
24  the request to produce, we have turned over

Page 63

1  everything we have; however, this has been
2  ongoing, obviously, with the liquidator, anything
3  of that nature.
4      Have there been more concrete
5  production since that time? Perhaps we will
6  perhaps take a second look, supplement responses
7  that we can give you guys. That's something we
8  are happy to take a second look at.
9      MR. RICE: My concern is we are not
10  going to address maybe some of these documents. I
11  just want to reserve for the record my right if I
12  have to redepose somebody in the case because
13  documents come up that have not supplemented, so I
14  am reserving my right to do that. I am not
15  suggesting that anything hasn't been turned over;
16  that sounds to me out there that I haven't seen.
17  We can talk about whether or not those are
18  responsive or not. That's all I am saying for
19  purposes of the record.
20      MR. SCOLARO: Fair.
21  BY MR. RICE:
22      Q. You had mentioned in your discussion
23  that you had offered to let American Automobile
24  come here and review all the claim files and

Page 64

1  participate in this. When was the first time that
2  you made American Automobile aware of this
3  problem?
4      A. As soon as I hired a law firm I had them
5  contact the claims division, David Perlmeter
6  (phonetic), the adjudicator. He would have that
7  in his file. That would have been in '07.
8      Q. Was there any period of time that
9  McClure & Associates and/or Brimar elected to try
10  to handle the problem before notifying American
11  Automobile?
12      MR. SCOLARO: Objection. Foundation as
13  to the term handle but --
14      THE WITNESS: What? What do you mean by
15  handle?
16  BY MR. RICE:
17      Q. You became aware in late 2005 that there
18  may be a problem with either RCA and AEG, correct?
19      A. Uh-huh.
20      Q. Did you immediately notify American
21  Automobile about that problem?
22      A. I had my attorneys notify them very
23  close to the claim that we became aware and put
24  them on notice.

Page 65

1      Q. Who was your attorney at that time?
2      A. Childress Duffy and Goldblatt. I
3  believe Kathleen Detrick was the person who first
4  was involved in that.
5      Q. Did you have any direct contact with
6  either Mr. Perlmeter or AEG directly?
7      A. Yes.
8      Q. Was that before or after you fired
9  Kathleen Detrick at Childress and Duffy?
10      A. After.
11      Q. So is it fair to say that the first
12  notice that was given to American Automobile on
13  behalf of McClure & Associates would have come
14  from Childress & Duffy?
15      A. Probably came from me, through my
16  attorneys. I am not sure who was involved. I
17  just know that I had conversations with David
18  Perlmeyer.
19      Q. But you believe that to be post your --
20  after Childress and Duffy?
21      A. I scheduled Childress & Duffy the day
22  Norm Cofeld showed up in my office.
23      Q. He is who?
24      A. The investigator for the Department of

17 (Pages 62 to 65)

Page 66

1    Insurance investigating RCA.
2        Q.  Again, just I am clear, you believe that
3    after hiring Childress & Duffy after the
4    investigator came would have been the first time
5    you would have reported the incident to American
6    Automobile or put them on notice of the potential
7    loss?
8        A.  After I found out about the potential of
9    stolen money.
10       Q.  Did you ever receive a response from
11   American Automobile?
12       A.  Nothing in writing that I can recall.
13   We did finally -- they had never given me a copy.
14   Kathleen was the first person to ever get a copy
15   of the policy sent.
16       Q.  When did you first notify American
17   Automobile of your intentions to seek
18   reimbursement for monies paid directly to
19   claimants?
20       A.  After the liquidator took the money that
21   we had to pay claims.
22       Q.  Do you recall when that was?
23       A.  The day they liquidated them.
24       Q.  Approximately how much money has been

Page 67

1    paid to claimants directly out of funds either
2    through Brimar & Ciarrachi or Brimar; do you know?
3        A.  McClure & Associates has paid probably
4    in excess of 600, $750,000. That's a guesstimate.
5        Q.  Has any of that money -- have you ever
6    been reimbursed from any source for any of the
7    money you paid directly?
8        A.  No.
9        Q.  So you never got any money from the
10   liquidation?
11       A.  No.
12       Q.  You indicated that you had conferred
13   with the Department of Insurance about using the
14   $1.3 million or so of client trust money to pay
15   back -- to pay claims?
16       A.  Correct.
17       Q.  You obtained their approval to do that,
18   correct?
19       A.  Correct.
20       Q.  Eventually they liquidated the company
21   and asked and took command of that money back?
22       A.  Actually told us -- no. They actually
23   stopped approving any payments.
24       Q.  Did that money end up -- turning that

Page 68

1    money over to the liquidator?
2        A.  Yes.
3        Q.  How much money was left out of the 1.3
4    million when you turned it over to the liquidator?
5        A.  I don't know. Maybe it was 1 million
6    200 some thousand. I am not sure.
7        Q.  So you hadn't made many claims out of
8    that money yet?
9        A.  No.
10       Q.  Do you know what the liquidator did with
11   that money?
12       A.  To the best of my knowledge, they
13   haven't paid one penny in claims to anybody.
14           To the best of my knowledge, they are
15   using it for ongoing expenses in going to court
16   and showing up and talking to the judge. To the
17   best of my knowledge, they will pay out hardly
18   anything. They are denying every claim that comes
19   down the pike to everybody.
20       Q.  Is there still an avenue by which you
21   could submit a request for reimbursement for any
22   money that has been paid directly by you to a
23   claimant?
24       A.  To who?

Page 69

1        Q.  To the liquidator.
2        A.  I am not sure.
3        Q.  Have you tried to figure out whether or
4    not that avenue is still available to you?
5        A.  You know, I have submitted all the stuff
6    I can so far.  I don't know that it's still
7    opened for continued opportunity.  They are
8    claims that are open.  The only thing that I am
9    allowed to submit are things that I have releases
10   for.  Most of those -- 90 percent of them are
11   taken care of.
12       Q.  The type of policies that you issue for
13   Worker's Comp insurance or the ones that you did
14   issue where AEG was involved, are we running into
15   a deadline of there can be no new claims coming
16   out of those policies, are you aware of?
17       A.  Typically, there is a two-year statute.
18       Q.  So we will reach a point in time where
19   there should be no new claims on those policies,
20   correct?
21       A.  Correct.
22       Q.  Are you aware whether or not we have hit
23   those limitations period, or are they still
24   ongoing?

18  (Pages 66 to 69)

Page 70

1     A. I think we have hit those limitations.
2  We haven't seen a new climb yet.
3     Q. You or Brimar haven't received any new
4  claims?
5     A. Uh-huh.
6     Q. When was the last time you think you
7  received --
8     A. No idea.
9     Q. That's information that Brimar might
10  have?
11    A. Typically with Worker's Compensation
12  are reported within 60 days, typically,
13  and, you know, I don't know what the limitation
14  is. I would have to find out, but I don't
15  expect -- it's not likely a bill we don't have
16  outstanding with some exposure.
17    Q. Are you aware of other claims that are
18  pending right now that have not been paid?
19    A. Yes.
20    Q. Do you know approximately how much money
21  is outstanding in unpaid claims?
22    A. No, because there are some cases have to
23  go to trial. There are some that were denied
24  coverage. You know, in the best case scenario,

Page 71

1  our defenses stand up. In the worse case scenario
2  we have to pay some of those. Could be a quarter
3  of a million dollars.
4     Q. You say the claim was denied. Who
5  denied those claims?
6     A. Brimar did.
7     Q. So Brimar made a decision on some of
8  these claims to deny them for whatever reason, is
9  that correct?
10    A. Yes. Fraudulent claim.
11    Q. In those instances attorneys were
12  retained to represent the employers in those
13  cases?
14    A. Yes.
15    Q. Those cases will likely go to trial?
16    A. Yes.
17    Q. So the exposure is their potential
18  adverse judgment against the employer?
19    A. Plus legal fees.
20    Q. You had certainly indicated before or at
21  least suggested before why did Brimar elect to pay
22  these claims directly?
23    A. McClure & Associates elected to do that
24  with Brimar; and if we didn't, the exposure was

Page 72

1  astronomical.
2     McClure & Associates would have been
3  sued by every insured that we had for every claim
4  that there was. The penalties would be beyond
5  anyone's ability to pay. It would go beyond the
6  limit that I have on the E & O insurance.
7     Q. It's fair to say you didn't have any
8  contractual obligation with any of these insureds
9  to step in in the event that AEG became
10  liquidated?
11    MR. SCOLARO: Objection. Calls for a
12  legal conclusion. To the extent the client
13  understands or knows the answer to that question,
14  he may answer.
15    THE WITNESS: I have a moral obligation.
16  BY MR. RICE:
17    Q. It wasn't my question. The question
18  was: Did you have one written contract with any
19  of them?
20    A. There was a contract of insurance with
21  every one of them.
22    Q. Did McClure & Associates have a written
23  contract with any of your clients to reimburse
24  them in the event that their insurer became

Page 73

1  insolvent?
2     A. No.
3     Q. Did you have any oral contract with any
4  of your clients to reimburse them in the event
5  their insurer became insolvent?
6     A. No.
7     Q. Did Brimar have any written contract
8  with any of your clients or their clients to
9  reimburse them for claims that were not paid
10  because an insurer became insolvent?
11    A. No.
12    Q. Did you have any oral contract to do
13  that?
14    A. No.
15    Q. When you made payments to claimants --
16  before you made a payment to a claimant, did you
17  contact American Automobile to discuss that
18  payment?
19    A. When they decided that they weren't
20  going to pay, yes. I told them that I was going
21  to pay claims. I told them before I told Perlmeyer
22  that we were going to pay claims to mitigate the
23  exposure. He made it very clear it was going to
24  be a long process; and they weren't going to send

19 (Pages 70 to 73)

Page 74

1    anyone out here to see these files.
2        Q.  Is it fair to say then that your
3    decision to pay these claims was a business
4    decision to help prevent those clients from suing
5    you in subsequent lawsuits?
6            MR. SCOLARO:  Objection.  Foundation.
7    Foundation regarding business decision, freezing
8    of business decision, and objection with respect
9    to the extent it calls for a legal conclusion, but
10   to the extent the client understands the question,
11   you may answer it.
12           THE WITNESS:  I don't really understand
13   the question.
14   BY MR. RICE:
15       Q.  You had indicated earlier that you were
16   concerned if you didn't pay these claims there was
17   potential huge exposure from McClure & Associates,
18   correct?
19       A.  Correct.
20       Q.  Is it fair to say in weighing those
21   options the decision you made was to pay those
22   claims in an effort to maybe prevent lawsuits
23   being filed against you?
24       A.  Yes.  It was to hire Austin Resolutions

Page 75

1    to reduce the outstanding obligation and to hire
2    law firms to represent the insureds and to
3    mitigate their exposure, and at the same time
4    mitigate the exposure back to myself knowing that
5    those exposures were much greater than my E & O
6    policy.
7        Q.  Now that the $1.3 million of trust money
8    is no longer available, what is the source of the
9    funds that is being used to pay these claims?
10       A.  My own personal revenue.
11       Q.  Is Mr. Ciarrachi putting any of his
12   personal funds in this as well?
13       A.  We are 50/50 partners so 50 percent of
14   his money goes in there too.
15       Q.  Is the money being paid out of the
16   McClure Ciarrachi partnership?
17       A.  Yes.
18       Q.  It's not coming out of McClure &
19   Associates or Brimar LTD?
20       A.  It's coming out of our funnel account.
21       Q.  Counsel represents one of the claimants
22   that has made a claim against McClure &
23   Associates, Genie Temporary Services.  Do you
24   recall when Genie first made a claim against you?

Page 76

1        A.  No.
2        Q.  I am showing you what's been marked as
3    Exhibit 4 for your deposition.  Just take a moment
4    to review that and let me know when you have had a
5    chance to do that.
6        A.  Okay.
7        Q.  Do you recognize that document?
8        A.  No.
9        Q.  Have you ever seen that document before?
10       A.  At one time.
11       Q.  Who's Bill Wall?
12       A.  A producer.
13       Q.  Does he work at this office?
14       A.  Yes.
15       Q.  Is he currently still employed with you?
16       A.  Yes.
17       Q.  He is one of your producers that has an
18   agency agreement with McClure?
19       A.  Yes.
20       Q.  Was Mr. Wall, the producer, responsible
21   for placing Genie Temporary Services Worker's Comp
22   with AEG?
23       A.  Yes.
24       Q.  Is Exhibit 4 a document or a type of

Page 77

1    document you would keep in the normal course of
2    business?
3        A.  It should be in the file.
4        Q.  Do you know whether Genie had reported a
5    claim to McClure & Associates before this letter
6    was received?
7        A.  Yes.
8        Q.  Yes, they had reported one earlier?
9        A.  This particular claim was reported, yes.
10       Q.  The claim of Mr. Ramirez?
11       A.  Yes.
12       Q.  Do you know whether Genie had reported
13   any other claims prior to Mr. Ramirez' claim?
14       A.  I'm not sure.
15       Q.  Speaking specifically about Mr. Ramirez'
16   claim, in light of the fact that this letter
17   obviously post-dates the liquidation of AEG, can
18   you kind of describe to me how you would handle a
19   claim like this knowing that it involves an AEG
20   policy?
21       A.  This particular claim happened during
22   the -- I don't know if this is a claim that was
23   prior -- this was in the cease and desist phase.
24   Is this a claim that's in the cease and desist

Page 78

1   claim? The claim that I am familiar with, Genie,
2   happened in the cease and desist phase of AEG, and
3   we couldn't do anything; and it went to trial, and
4   there was an award given, $23,000.
5       After the cease and desist we agreed
6   that we would pay that 23,000, but the attorney
7   had already gone in and gotten sanctions and
8   increased that to offer a hundred thousand
9   dollars, and we asked for the defense from our
10  E & O carrier the defendants go back in and get
11  that reduced down to the $23,000 and then we would
12  deny it.
13      Q. Let me ask you this: If a claim like
14  this were to be submitted today where you got a
15  letter from a client saying John Q was injured at
16  work; here is our claim we are submitting, could
17  you walk me through what you would do today to
18  facilitate or administer that claim?
19      MR. SCOLARO: Objection to the extent
20  that a claim -- phrase it a claim like this, a
21  foundation -- I am not quite sure what that refers
22  to, but to the extent the deponent understands the
23  question, he may answer it.
24      THE WITNESS: Tell me if you're talking

Page 79

1   about a claim came in from AEG from a claim, or
2   what are you talking about?
3   BY MR. RICE:
4       Q. I am going to give strictly a
5   hypothetical right now. I want to try to
6   understand what's going on here in terms of the
7   administration of claims involving clients who
8   once had insurance with AEG.
9       A. Uh-huh.
10      Q. If one of your clients sent you a letter
11  or sent Brimar a letter saying one of my employees
12  has made a Worker's Comp claim; I want to submit
13  it to you so you're aware of it; and that claim
14  obviously can no longer be paid by AEG directly,
15  so walk me through how you and Brimar or you and
16  Mr. Ciarrachi would go through deciding how we are
17  going to handle this claim.
18      A. You're going to have to be very specific
19  with me. Give me a date that your claim happened.
20  Tell me it was one of the insureds and what
21  program they were under, and then I can tell you
22  specifically what would happen.
23      Q. Let's say it was an insurance policy
24  that was issued from 2005, late 2005 to '07, the

Page 80

1   time period in which you were writing AEG
2   insurance, and the claim occurred during one of
3   those policy periods.
4       A. Okay. Knowing that the A and O carrier
5   has made every attempt not to pay me anything or
6   be involved in any way, I would first of all
7   investigate the claim of hiring an adjuster to
8   investigate and find out if the claim was
9   compensible. If there are witnesses, we would do
10  an entire workup. If it was a case that had
11  attorney representation, we would probably hire a
12  law firm and, you know, represent our insured,
13  depending. It may be -- I'm not sure. Coming
14  in this late I am not sure that there would be any
15  coverage. We might just deny the claim. I
16  don't know. It really depends on the nature of
17  the claim and what happened. I can't imagine we
18  could still have a claim that would be able to be
19  turned in.
20      Q. Correct me if I am wrong, as part of
21  your hesitancy are at least the concern that it
22  might be different depending on when the claim was
23  made. Is that based on the fact if the claim were
24  reported to you during -- Strike that.

Page 81

1       If the claim had occurred during the
2   two-year period when AEG was still operable, would
3   your answer change if the claim was made or claim
4   occurred post AEG liquidation?
5       A. You said AIG; then you changed it to
6   AEG.
7       Q. Would your answer change in terms of how
8   you would handle a claim if the date of loss
9   occurred during the time in which AEG was still in
10  operation versus a claim that was made perhaps two
11  years after AEG went into liquidation?
12      A. Absolutely.
13      Q. How would that change; would that fact
14  change? How you handle a claim?
15      A. When AEG was operating, AEG paid for all
16  claims. They funded the claims. Those claims
17  were discussed with Mike Ward. Mike Ward would
18  come in every week, sit down with two guys handing
19  the claims, go over payments, everything from the
20  outside investigation that was done to attorney's
21  fees, you know, settlements, all of that was done
22  by AEG or approved by AEG. After the fact all of
23  that moved from the producers that were handling
24  it back over to myself and Dave because we are the

21 (Pages 78 to 81)

Page 82

1 ones who are responsible.
2 Q. When is the last time you dealt with
3 Mike Ward?
4 A. Cease and desist. I have never talked
5 to him since.
6 Q. Aside from you and Dave Ciarrachi is
7 anybody else involved in the process that you have
8 described to us in terms of deciding how to pay
9 claims?
10 A. (Shaking head.)
11 Q. That's a no?
12 A. That's no. Other than our attorneys that
13 we hire.
14 Q. Sure. Of course. You said you
15 represent or work with at least six or seven other
16 insurance companies, correct?
17 A. Correct.
18 Q. Have you ever encountered a situation
19 like this where you have had to assume essentially
20 the role of an insurer and hire attorneys and
21 defend claims and pay out claims directly?
22 A. We have never experienced anything like
23 we have experienced with AEG. Have we had the
24 ability to hire law firms and to adjudicate

Page 83

1 claims? Absolutely.
2 Q. That's strictly on an insurer-by-insurer
3 basis?
4 A. By a contract by contract. Some of our
5 insureds have million dollar deductibles, and we
6 become the administrators of all claims under
7 $50,000, and we have a reporting procedure of
8 anything over $50,000. Others have higher
9 threshholds or lowered threshholds. Some of our
10 companies in the past have given us draft
11 authority. Some we have checks right here, and we
12 will handle day-to-day claims and report back.
13 Eventually they will come in and take a look at
14 where we are at.
15 Q. One of the things you mentioned earlier
16 was the fact that you didn't receive an insurance
17 policy from American Automobile until I think
18 Kathleen Detrick got a copy of it for you?
19 A. Correct.
20 Q. How did you enroll in the program with
21 American Automobile?
22 A. Through the computer.
23 Q. I assume a feature of the computer did
24 not allow you to print off a copy of the policy?

Page 84

1 A. They told me that I wouldn't get one.
2 I only get a certificate. I asked three years in
3 a row for a policy. They said no. I had been
4 with Utica before. It's the first time in my life
5 I couldn't get a copy of a policy.
6 Q. Who told you that?
7 A. That was the Brown and Brown who handled
8 the account for this particular program. I only
9 signed up for them because one of my carriers told
10 me you ought to sign up on our policy. He told me
11 it was a master program, and I didn't get a copy.
12 Q. How many years were you insured with
13 American Automobile?
14 A. Five, six, seven.
15 Q. Do you know the period in time in which
16 you have been insured with them?
17 A. Probably clear back to '03, '04,
18 something like that.
19 Q. The policy that was attached to the
20 complaint in this case had an effective period of
21 June 1st of '06 to June 1st of '07, reinsured five
22 years prior to that period, or is that in the
23 middle of the period?
24 A. Probably in '03 or '04. It was a June

Page 85

1 inception and expiration date on that policy. I
2 have held it in place for years.
3 Q. Do you recall when you terminated your
4 relationship with American Automobile?
5 A. I have never terminated it.
6 Q. So you're still with American
7 Automobile?
8 A. Of course I am.
9 Q. You have a policy now, a copy of the
10 policy, right?
11 A. Now they give policies.
12 Q. When did they start giving policies?
13 A. After I asked for them, after my
14 attorney asked for them.
15 Q. Do they mail you one annually?
16 A. No.
17 Q. How do you get it?
18 A. You have to get it off the computer.
19 Q. But that future was not available to you
20 back in 2006?
21 A. No.
22 MR. RICE: I don't have any further
23 questions.
24 MR. SCOLARO: I have got a couple

22 (Pages 82 to 85)

Page 86

1    things; but, Bob, do you have anything?
2         MR. GORBOLD:  Give me just a second,
3    please.
4         MR. SCOLARO:  Sure.
5         MR. GORBOLD:  No.  I have nothing.
6         MR. SCOLARO:  I have a few questions.
7              CROSS EXAMINATION
8              BY MR. SCOLARO:
9         Q.  Brian, Dana asked a question regarding
10   the A rating of RCA, and he went on to ask how
11   often you check the rating.  Is it fair to say
12   that it's customary practice in the insurance
13   broker agency business to check the rating of a
14   carrier prior to placing coverage with them?
15        A.  On an annual basis ratings change.
16   Typically on an annual basis you'll take a look
17   one time a year, but here when companies let --
18   when they have been downgraded from an A to B plus
19   and so, you know, it's not a typical practice
20   where agents sit down and say look.  When you're
21   selling a program like the AEG program, you're
22   forced to look at that a little bit more often
23   because you're printing it off the computer
24   system.  That's why I said when our insureds would

Page 87

1    ask because they want to know what it's rated.
2    In addition, I contacted Eddie McCreety and asked
3    her what the rating was.
4         Q.  Dana talked about claims being paid, how
5    those payments were made.  You mentioned McClure &
6    Ciarrachi, how we sort of termed it, funnel
7    account.  Part of that funnel account is paid
8    into by B.D. McClure & Associates, isn't that
9    correct?
10        A.  The majority of all money in that funnel
11   account comes from McClure & Associates.
12        Q.  Is it not fair to say that when clients
13   called with claims, were they threatening to take
14   legal action against one of the entities here?
15        A.  Everyone said if we didn't pay those
16   claims, they were going to sue McClure &
17   Associates because we are the broker.
18        Q.  It was McClure & Associates specifically
19   that those clients were threatening to sue?
20        A.  That's who they purchased the insurance
21   from.
22        Q.  You said that the day --
23             We talked about when notification was
24   made to AAIC with respect to the fact that they

Page 88

1    might first start having claims and you
2    mentioned -- you stated that was right around the
3    time that the investigator -- I think his name
4    is -- I don't actually recall what his name is.
5         A.  Norm Cofed (phonetic).
6         Q.  It was right around the time that Cofed
7    had come in here, is that not correct?
8         A.  It was sometime after that, yes.
9         Q.  Would it be fair to say that you
10   notified AAIC as soon as practical?
11             MR. RICE:  Objection.  Calls for a
12   legal conclusion, but you can answer if you
13   understand what the question is.
14             THE WITNESS:  I contacted them as soon
15   as I knew there was an exposure, a potential
16   exposure, that could or may turn into a claim or
17   may not.
18   BY MR. SCOLARO:
19        Q.  Give me a second, please.
20             With respect to Dallas National, you
21   mention that you took clients who had previously
22   been in the AEG with AEG and you had moved them to
23   Dallas National, is that correct?
24        A.  Correct.

Page 89

1         Q.  Was it your opinion that in doing so
2    that you have mitigated damages to the extent that
3    they were owed to -- they were incurred by
4    McClure & Associates?
5         A.  Absolutely.  If I didn't move and get a
6    carrier and get them that quickly, the exposure
7    would continue to grow, and Dallas started
8    collecting claims, starting coming in a day or two
9    after they took over.
10             MR. SCOLARO:  Did we enter a copy of the
11   policy as an exhibit?
12             MR. RICE:  We did not.
13   BY MR. SCOLARO:
14        Q.  I only have three copies of this so,
15   Bob, you might be short on one.
16             Brian, could you just turn to the
17   back.  I think this would be page -- what is
18   marked at the top as Page 28 of 31.
19        A.  Okay.
20        Q.  I am going to read this and just tell me
21   if I am reading this correctly as you see it here.
22   "Consideration premium charge is hereby agreed and
23   understood that Section 4:  Definitions, l,
24   professional services is amended to include the

23  (Pages 86 to 89)

Page 90

1  following: Sale of professional employer
2  organization plans including the sale and
3  placement of insurance products within the plan
4  but excluding the administration or servicing of
5  any PEO plan?
6      A.  Yes. That's correct.
7      Q.  Is it your understanding that AEG falls
8  into that definition of a PEO plan?
9      A.  Yes.
10         MR. SCOLARO: I think I'm done. I just
11  want to be sure. Yeah, I'm done.
12         MR. RICE: I just have one quick
13  follow-up.
14         REDIRECT EXAMINATION
15         BY MR. RICE:
16     Q.  Your attorney had asked you a couple of
17  questions about claimants that may contact
18  McClure, and the concern you had which was that
19  they would sue you if you didn't resolve this
20  problem. Do you remember that question?
21     A.  Yes.
22     Q.  Did any of those claimant's clients ever
23  have attorneys contact you directly?
24     A.  Yes.

Page 91

1      Q.  Aside from Genie's attorney have any
2  other attorneys representing clients or former
3  clients of McClure ever contacted you relating to
4  claims involving AEG insurance?
5      A.  Yes.
6      Q.  How many would you say?
7      A.  Three or four.
8      Q.  Have any of those attorneys and/or
9  claimants filed suit against McClure?
10     A.  No, because we mitigated the damages.
11     Q.  Did any of those attorneys when they
12  were shifting the claims on behalf of their
13  clients and your clients ever send you copies of
14  complaints saying we would file this if we don't
15  get a response within a certain amount of time?
16     A.  It was verbal.
17     Q.  You never received any follow-up letters
18  from any of them either?
19     A.  We took care of the problems.
20         MR. RICE: I have no further questions.
21         MR. SCOLARO: I don't either.
22         Reserved signature.
23         MR. GORBOLD: I do have a question.
24         CROSS EXAMINATION

Page 92

1         BY MR. GORBOLD:
2      Q.  Mr. McClure, are you aware that as a
3  result of the Ramirez claim there was a collection
4  action filed in Florida against Mr. Sippel
5  personally?
6      A.  Yes.
7      Q.  Are you aware that as a result of the
8  Ramirez claim that the payroll accounts for Genie
9  Temporary Services and JES were garnished?
10     A.  Yes.
11     Q.  You had submitted that claim to AAIC for
12  help in mitigating that loss?
13     A.  Yes, I did.
14     Q.  They had refused to cover it?
15     A.  Yes.
16         MR. GORBOLD: That's all I have.
17         RECROSS EXAMINATION
18         BY MR. SCOLARO:
19     Q.  I have one more question then. Is it
20  fair to say then, Brian, that AAIC never issued a
21  determination; despite all of your correspondence
22  with them, they never issued a determination with
23  respect to denying of coverage or acceptance of
24  coverage on this?

Page 93

1      A.  Yes.
2      Q.  They didn't do so for quite some time?
3      A.  Years.
4      Q.  And then would you say that the first
5  actual -- I guess you could call it a quasi
6  determination by them was them filing suit?
7      A.  Yes.
8         MR. SCOLARO: That's all I have.
9         (WHEREUPON, said documents were
10         marked McClure Deposition Exhibit
11         Nos. 1-5, for ID, as of 2/16/10.)
12         *   *   *   *

24  (Pages 90 to 93)

Page 94

1      CERTIFICATE
2          OF
3      CERTIFIED SHORTHAND REPORTER
4
5          I, THERESE M. SONNEMAKER, a Certified
6      Shorthand Reporter of the State of Illinois, CSR
7      License No. 84-2414, do hereby certify:
8          That previous to the commencement of
9      the examination of the aforesaid witness, the
10     witness was duly sworn by me to testify the whole
11     truth concerning the matters herein;
12         That the foregoing deposition
13     transcript was stenographically reported by me and
14     was thereafter reduced to typewriting under my
15     personal direction and constitutes a true and
16     accurate record of the testimony given and the
17     proceedings had at the aforesaid deposition;
18         That the said deposition was taken
19     before me at the time and place specified;
20         That I am not a relative or employee or
21     attorney or counsel for any of the parties herein,
22     nor a relative or employee of such attorney or
23     counsel for any of the parties hereto, nor am I
24     interested directly or indirectly in the outcome

Page 95

1      of this action.
2          IN WITNESS WHEREOF, I do hereunto set
3      my hand at Chicago, Illinois, this 27th day of
4      August, 2010.
5
6
7      _____
8          THERESE M. SONNEMAKER, CSR
9          CSR License No. 84-2414
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25 (Pages 94 to 95)