# EXHIBIT B

DAVID A. CIARRACHI                                April 27, 2010

---

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION

AMERICAN AUTOMOBILE        )
INSURANCE COMPANY, a       )
Missouri corporation,      )
            Plaintiff,     )
        -vs-               ) Case No.
B.D. McCLURE AND           ) 1:09-cv-01589
ASSOCIATES, LTD., et al.,  )
            Defendants.    )
```

The deposition of DAVID A. CIARRACHI, called
for examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before ALICE M. SCHWINGER, CSR
NO. 84-2913, a Notary Public within and for the
County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said state, at 2067
Burlington Avenue, Lisle, Illinois, on the 27th day
of April, A.D. 2010, commencing at 9:30 a.m.

---

**Page 2**

```
 1  PRESENT:
 2      HINSHAW & CULBERTSON, LLP,
 3      (222 North LaSalle Street, Suite 300,
 4      Chicago, Illinois 60601,
 5      (312) 704-3000), by:
 6      MR. DANA A. RICE,
 7         appeared on behalf of the Plaintiff;
 8      CONNELLY, ROBERTS & McGIVNEY, LLC,
 9      (55 West Monroe Street, Suite 1700,
10      Chicago, Illinois 60603,
11      312/251-9600), by:
12      MR. JEFFREY J. SCOLARO,
13         appeared on behalf of B.D. McClure and
14         Associates;
15      KAVANAGH, GRUMLEY & GORBOLD, LLC,
16      (111 North Ottawa Street,
17      Joliet, Illinois 60434,
18      815/727-1586), by:
19      MR. PAUL RICHARDS,
20         appeared on behalf of Dale J. Sippel
21         d/b/a Genie Temporary Services;
22
23  REPORTED BY:  ALICE M. SCHWINGER, CSR
24         CSR No. 84-2913.
```

---

**Page 3**

1   (WHEREUPON, the witness was duly
2   sworn.)
3   DAVID A. CIARRACHI,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6   DIRECT EXAMINATION
7   BY MR. RICE:
8   Q.   Mr. Ciarrachi, am I pronouncing that
9   correctly?
10  A.   Ciarrachi.
11  Q.   Could you please state and spell your
12  full name for the record?
13  A.   David Anthony Ciarrachi,
14  C-I-A-R-R-A-C-H-I.
15  MR. RICE: Let the record reflect that this is
16  the deposition of David Ciarrachi taken in the case
17  of American Automobile Insurance Company
18  B.D. McClure and Associates, Case No. 09 CV
19  which is currently pending in the United States
20  District Court for the Northern District of
21  Illinois.
22       This deposition is being taken pursuant
23  to subpoena and notice and in accordance with the
24  Federal Rules of Civil Procedure, the United States

---

**Page 4**

1   District Courts.
2   BY MR. RICE:
3   Q.   Mr. Ciarrachi, my name is Dana Rice.  I
4   represent American Automobile Insurance Company in
5   a lawsuit involving B.D. McClure and Associates and
6   Genie Temporary Services; okay?
7   A.   Mm-hmm.
8   Q.   I'm going to be asking you a series of
9   questions today.  Have you ever given a deposition
10  before?
11  A.   Yes.
12  Q.   So you're very familiar with the
13  process.  If at any time today you don't understand
14  my question or it's too convoluted, which often
15  happens when I ask questions, just let me know, I'd
16  be happy to reask it, rephrase it.  If you answer a
17  question that I ask, I'll assume you understood
18  what I was asking and that was your answer; is that
19  fair?
20  A.   Yes.
21  Q.   I know that sometimes during the course
22  of the conversation, you know -- you may know
23  exactly what I'm asking for and you know what your
24  answer is going to be.  Just let me finish my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                          April 27, 2010

5

1  question before you answer, it's just for the
2  benefit of the court reporter --
3     A.   Sure.
4     Q.   -- so down the road when we try to read
5  this two months from now, it reads well.
6     A.   Yes.
7     Q.   And then make sure that all of your
8  answers to my questions are verbal, yes, no or an
9  answer, rather than uh-huh or uh-uh, those are
10  difficult for the court reporter to take down;
11  okay?
12     A.   Yes.
13     Q.   And then if at any time you need to take
14  a break, use the restroom, I'm more than happy to
15  do that, just let me know; okay?
16     A.   Okay.
17     Q.   At the outset, are you aware of any
18  conditions you have or any medications that you
19  taking that would affect in any way your ability to
20  give truthful and complete answers to my questions
21  today?
22     A.   No.
23     Q.   Did you review any documents in
24  preparation for your deposition today?

6

1     A.   Yes.
2     Q.   What documents did you review?
3     A.   An overall letter that Jeff Scolaro had
4  provided for me about the substance of a deposition
5  that my partner, Brian McClure, had given me.
6     MR. RICE:  And Jeff, just so I'm clear, are
7  you representing Mr. Ciarrachi in this -- as it
8  pertains to this case?
9     MR. SCOLARO:  We are.
10     MR. RICE:  And so I will assume you're going
11  to assert attorney-client privilege over the
12  letter?
13     MR. SCOLARO:  I am.
14  BY MR. RICE:
15     Q.   Aside from Jeff Scolaro, did you speak
16  with anyone else about your deposition today?
17     A.   No.
18     Q.   You didn't talk to Mr. McClure about it?
19     A.   About this deposition or his deposition?
20     Q.   Your deposition today.
21     A.   No.
22     Q.   Did you talk about his deposition?
23     A.   Yes.
24     Q.   What did you talk about?

7

1     MR. SCOLARO:  I object on the basis of
2  attorney-client privilege to the extent that there
3  was anything referred to in our -- in Brian and
4  Dave's conversation, but to the extent that there
5  wasn't anything that was discussed, it may or may
6  not be attorney-client privilege and Dave may
7  answer the question.
8        Maybe you can repeat that.
9  BY THE WITNESS:
10     A.   No, I understand.
11  BY MR. RICE:
12     Q.   Did you speak to Brian McClure about the
13  substance of his deposition which in any way didn't
14  relate to things that you either got from
15  Mr. Scolaro in that letter or that, you know, was a
16  general --
17     A.   No, it was a general conversation about
18  the substance of his deposition.
19     Q.   Mr. Ciarrachi, when were you born?
20     A.   8/23/43.
21     Q.   '43?  I'm sorry.
22     A.   '43.
23     Q.   Where do you currently live?
24     A.   1012 South Cherry Lane, Lombard,

8

1  Illinois.
2     Q.   And do you have any plans on moving from
3  that address any time soon?
4     A.   No.
5     Q.   If you could just briefly describe to me
6  your educational background.
7     A.   College, Elmhurst College, 1968.
8     Q.   What degree did you obtain at Elmhurst?
9     A.   Marketing and psychology.
10     Q.   Any post-graduate work?
11     A.   No.
12     Q.   Where are you currently employed?
13     A.   I'm a partner in McClure and Associates
14  and Brimar Administration at -- what's the address
15  here -- 2067 Burlington Avenue, Lisle, Illinois.
16     Q.   And the name, full name of Brimar is
17  what?
18     A.   Brimar Administration.
19     Q.   Is that a company?
20     A.   Yes, it's an LLC.
21     Q.   Do you know when it was formed?
22     A.   Exact date, no, but sometime in the
23  early '80s.
24     Q.   Are you a partner in the LLC?

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                         April 27, 2010

9

1    A.   Yes.
2    Q.   Are you the sole partner?
3    A.   No.
4    Q.   Who else is a partner in Brimar
5  Administration, LLC?
6    A.   Brian McClure.
7    Q.   Anyone else?
8    A.   No.
9    Q.   What's your position within Brimar?
10   A.   President.
11   Q.   And how long have you been the president
12  for?
13   A.   Since the date of its LLC incorporation.
14   Q.   Has Brimar been in business since its
15  incorporation?
16   A.   Before then.
17   Q.   And prior to that, did it -- was it
18  working or operating under any different name?
19   A.   No.
20   Q.   You just hadn't formally incorporated --
21   A.   It was a sole proprietorship prior to
22  the LLC formation.
23   Q.   Do you know when Brimar started doing
24  business?

10

1    A.   1976.
2    Q.   If you could, just briefly describe to
3  me what Brimar does.
4    A.   We're an administration company for
5  McClure and Associates in that we have several
6  clients who we unbundle coverages for in the
7  that we act as their claims administrator for the
8  portion of the policy that they have taken upon
9  themselves through a deductible format.
10   Q.   Would that apply to both deductibles
11  and, for example, SIRs?
12   A.   Yes.
13   Q.   Just so I understand, so if a client of
14  McClure and Associates purchased several
15  types of insurance, commercial, auto, CGL,
16  whatever, to the extent they decided to have a
17  deductible on any facet of that coverage or an
18  in the facet of that coverage, you would serve as
19  the claims administrator for that particular
20  portion of coverage?
21   A.   If they chose to do that and the carrier
22  allowed us to do that.
23   Q.   Is that carrier specific?
24   A.   I'm not -- I don't quite follow that.

11

1    Q.   Is the ability for Brimar to act as an
2  administrator for the insured carrier specific,
3  meaning do certain carriers allow you to do that
4  and certain ones don't?
5    A.   It's on a negotiated basis.
6    Q.   And would you negotiate that both with
7  the carrier and the insured?
8    A.   Yes.
9    Q.   Are you a licensed insurance broker?
10   A.   No.
11   Q.   Have you ever been?
12   A.   No.
13   Q.   Do you hold any other insurance-related
14  licenses?
15   A.   No.
16   Q.   Do you need to to be an administrator?
17   A.   No.
18   Q.   Did you take any additional educational
19  courses or anything like that post your graduate
20  degree in Elmhurst to operate Brimar?
21   A.   I was a formal -- I was a former
22  employee of the insurance industry as a bodily
23  injury adjuster and a commercial claims manager,
24  and during that period of time, I took numerous

12

1  classes at the insurance institute adjusting CPCU,
2  various associated courses to my occupation with
3  the insurance industry.
4    Q.   So this would have been sometime before
5  the early '70s or mid '70s?
6    A.   Late '60s and '70s, yes.
7    Q.   What carrier were you working for back
8  then?
9    A.   When I was the claims manager or
10  adjuster?
11   Q.   Do the adjuster first.
12   A.   Home Indemnity of New York.
13   Q.   Where was that based out of?
14   A.   10 South Riverside Plaza in Chicago.
15   Q.   And you were a claims administrator for
16  them?
17   A.   No, I was a claims adjuster.  I then
18  became a claims manager for Nationwide Insurance
19  Company who are based in Columbus, Ohio.
20   Q.   When did you start with Home Indemnity?
21   A.   1966.
22   Q.   And then when did you join Nationwide?
23   A.   1972.
24   Q.   After you left Nationwide, is that when



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

13
1   you started up Brimar?
2       A.   Brimar was ongoing while I was with
3   Nationwide on a part-time basis, and then when
4   Brian McClure and myself became partners in
5   the agency and the administration company, we
6   formulated the outline of the program I had given
7   you earlier.
8       Q.   So is it fair to say that while you were
9   working at Nationwide, you were also adjusting
10  claims through Brimar?
11      A.   Yes.
12      Q.   Did Brimar have an administration
13  agreement with Nationwide or --
14      A.   No.
15      Q.   -- was it just --
16      A.   No.
17      Q.   Did you administer any Nationwide
18  policies?
19      A.   No.
20           Let me take that back.  When you say
21  administer Nationwide policies, we wrote an
22  with Nationwide while I was with McClure that
23  us administration ability.  In other words,
24  Nationwide gave us the ability to administer the

14
1   program as I described earlier, so at that point in
2   that program, we were the administrator for that
3   account.
4       Q.   Okay.  How many employees does Brimar
5   currently have?
6       A.   I'm not certain how they -- how our
7   accountant breaks down the differential of
8   employees between Brimar and McClure because
9   jointly owned 50 percent and I'm not sure how the
10  accounting process works as to which employee is a
11  Brimar employee, which employee is a McClure
12  employee.
13      Q.   I understand that Brimar operates out of
14  the office we're currently at?
15      A.   That's right.
16      Q.   I also understand that McClure and
17  Associates also operates out of this office?
18      A.   That's right.
19      Q.   It's my understanding in speaking with
20  Mr. McClure at his deposition that both Brimar and
21  McClure and Associates share staff; is that fair?
22      MR. SCOLARO:  Could you define staff?
23  BY MR. RICE:
24      Q.   First of all, how many people answer the

15
1   phones for Brimar?
2       A.   It's a joint venture, so I would say
3   that's a shared staff.
4       Q.   So how many -- do you have any -- how
5   many people do you believe to be shared staff
6   between Brimar and McClure and Associates?
7       A.   I would say probably everybody here is,
8   some to a much greater degree than others.
9       Q.   So during the course of the day, one
10  member of McClure and Associates staff may have
11  more duties with respect to McClure and
12  than does Brimar, but there could be some
13      A.   That's right.
14      Q.   Is there anybody that works at this
15  office that works exclusively for Brimar?
16      A.   No.
17      Q.   Is there anybody at this office that
18  works exclusively for Mr. McClure?
19      A.   No.
20      Q.   Is there anyone outside of this office
21  that works for Brimar?
22      A.   No.
23      Q.   So every staff member and/or employee
24  that is paid by Brimar would be located at this

16
1   office?
2       A.   The payment of employees is a joint
3   venture, there would be no employee paid
4   specifically by Brimar.
5       Q.   Would the payment then come from McClure
6   and Associates or the combination of McClure and
7   Ciarrachi?
8       MR. SCOLARO:  Objection:  Asked and answered,
9   but go ahead.
10  BY THE WITNESS:
11      A.   It would be -- again, it's an accounting
12  procedure.  I'm not certain how the accountant has
13  the spread of distribution to salary.
14  BY MR. RICE:
15      Q.   I saw -- you know, we've exchanged a lot
16  of documents in this case and I saw Brimar's name
17  listed a number of different ways, so I just want
18  to ask you if it may be a mistake they were written
19  this way or these may have been prior companies, I
20  just want to make sure.
21           Is there any such entity as Brimar
22  Investigations, Inc.?
23      A.   That was the sole proprietorship.
24      Q.   So that's what --



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                                April 27, 2010

17

1    A.   Same company.
2    Q.   That was what Brimar started at prior to
3  its formation as an LLC?
4    A.   That's right.
5    Q.   So is it fair to say then that was
6  formed sometime in the early '70s?
7    A.   Early '80s.
8    Q.   The Brimar Investigations?
9    A.   No, the Brimar Administration.
10    Q.   When was Brimar Investigations started?
11    A.   In the mid '70s, I think it's '76, '77,
12  something like that.
13    Q.   And again, Brimar Investigations
14  provided essentially the same services as Brimar
15  Administration, it was just a different name?
16    A.   No, no.  Basically what that -- I was
17  the sole proprietor with Brimar Investigations and
18  I did investigational work, sometimes pre-trial,
19  sometimes for an insurance company on a fee
20  So I worked for many companies.
21        There was no coverage involved or no
22  separation of coverage and claims administration
23  when I was working as a sole proprietor, strictly
24  an investigational phase of my business operation.

18

1    Q.   So a carrier may hire you to help assist
2  in preparing a matter for trial, for example?
3    A.   That's right.
4    Q.   There was no adjustment of claims
5  process at that point?
6    A.   Or a law firm may hire me.  As a matter
7  of fact, your law firm hired me.
8    Q.   Oh, really?
9    A.   Yes.
10    Q.   When did we hire you, do you recall?
11    A.   Late '60s.
12    Q.   Probably before I was born; right?
13    A.   A long, long time ago.
14    Q.   Who did you work with?
15    A.   I couldn't tell you their names.
16    Q.   Do you remember what the case was?
17    A.   No.  Numerous cases.
18    Q.   I also saw the name Brimar Industries?
19    A.   Never heard of it.
20    Q.   Aside from Brimar Investigations, which
21  was the sole proprietorship, and then Brimar
22  Administration, have you operated under any other
23  name?
24    A.   No.

19

1    Q.   Has there ever been any other Brimar
2  names that you're aware or that you've been
3  associated with?
4    A.   No.
5    Q.   What is Brimar's relationship with B.D.
6  McClure and Associates?
7    A.   I answered that question earlier.
8    Q.   Could you answer it again?
9    A.   Well, we -- in certain policies, we will
10  present to a given prospective client an option of
11  administration of claims that they may not want
12  done by the carrier and they want unbundled
13  done by us as an administrator.
14    Q.   How long have you been administering
15  claims for McClure and Associates?
16    A.   Since 198 -- whatever the year is I told
17  you we were made an LLC.
18    Q.   How long have you known Brian
19    A.   Since about 1980.
20    Q.   Did you know him prior to becoming a
21  partner with him?
22    A.   Yes.
23    Q.   On a personal level then?
24    A.   No.

20

1    Q.   So solely business partners?
2    A.   He was with Nationwide Insurance Company
3  as a salesman, I was there as a claims manager.
4    Q.   And at some point while you were at
5  Nationwide, you decided to branch off and do your
6  own thing?
7    A.   We thought we could make a better wheel.
8    Q.   Mr. McClure mentioned during his
9  deposition that in addition to B.D. McClure and
10  Associates and Brimar Administration, there was
11  this third entity created called McClure and
12  Ciarrachi, LLC?
13    A.   It's a funnel account for the funds of
14  both corporations.
15    Q.   I didn't catch the -- funnel account for
16  both?
17    A.   Corporations, with LLCs, funnel all of
18  their -- the revenues into one which is the,
19  whatever you called it, the --
20    Q.   McClure and Ciarrachi Associates?
21    A.   Yeah.
22    Q.   Just so I'm clear for the record --
23    A.   There are no employees in that grouping,
24  that's strictly an accounting name for the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                          April 27, 2010

21

1  funneling of -- in how we handle our finances.
2      MR. SCOLARO: I want to take a quick break
3  after he's done answering this question.
4  BY MR. RICE:
5      Q.  And I just want to make sure for the
6  record because I know exactly what you're saying, I
7  just want the record to be clear, the McClure and
8  Ciarrachi Associates is a funnel account where
9  money is funneled from B.D. McClure and Associates
10  and Brimar Administration; is that correct?
11      MR. SCOLARO: Objection to the extent that my
12  client is not an accountant, but to the extent he
13  understands the question.
14  BY THE WITNESS:
15      A.  I understand what you're saying, but
16  again, you know, the accounting procedures, I'm not
17  involved day-to-day in the accounting procedures,
18  so I couldn't tell you exactly with absolute
19  certainty how that works, and rather than tell you
20  something that I'm guessing at, I would rather not
21  answer that question specifically.
22      MR. RICE: If you want to take a break, I have
23  more questions about this organization but --
24      MR. SCOLARO: It will be two minutes.

22

1          (WHEREUPON, a short break was
2          taken.)
3  BY MR. RICE:
4      Q.  Before the break we were talking about
5  McClure and Ciarrachi and Associates, the funnel
6  account that was created.
7      A.  Mm-hmm.
8      Q.  Besides you and Mr. McClure, who else
9  was involved in that LLC?
10      A.  I don't believe anybody else is.
11      Q.  Do you know when the McClure and
12  Ciarrachi LLC was formed?
13      A.  At the same time as the Brimar LLC, I
14  believe. And again, I'm guessing here, I'm not 100
15  percent certain because you're going into an area
16  of accounting that I'm not familiar with and I
17  don't normally keep track of.
18      Q.  And does Brimar and McClure and
19  Associates share the same accountant?
20      A.  Yes.
21      Q.  And who is your accountant?
22      A.  Howard Gamer.
23      Q.  Is that G-A-M-E-R?
24      A.  Mm-hmm.

23

1      Q.  Where is he located?
2      A.  Northbrook, Illinois.
3      Q.  Is he with a company?
4      A.  He is, but I couldn't tell you the name
5  of it.
6      Q.  Do you and Mr. McClure own equal
7  interest in the McClure and Ciarrachi LLC?
8      A.  Yes.
9      A.  50/50?
10      A.  Yes.
11      Q.  And do you own a 50 percent interest in
12  McClure and Associates?
13      MR. SCOLARO: Objection: Asked and
14  but go ahead.
15  BY THE WITNESS:
16      A.  Yes.
17  BY MR. RICE:
18      Q.  And then McClure -- Mr. McClure owns
19  50 percent of Brimar; correct?
20      A.  Yes.
21      Q.  The subject matter of this lawsuit
22  involves a lot of claims that are related to
23  insurance that was sold involving AEG. Are you
24  familiar with that?

24

1      A.  Yes.
2      Q.  Do you know when McClure started
3  soliciting or selling AEG insurance?
4      A.  I'd be guessing, but '05 or '06.
5      Q.  Do you know approximately how long
6  Mr. McClure sold AEG insurance for?
7      A.  Until May of '07, I believe.
8      Q.  And if we use your range of '05, '06 to
9  May of '07, we'll just -- for purposes of this
10  deposition, we'll call it about a year; okay?
11      A.  Yes.
12      Q.  Just for our purposes of discussion.
13          During that year period of selling AEG
14  insurance, how long during that period did Brimar
15  administer claims for AEG?
16      A.  The entire time.
17      Q.  And did Brimar administer claims after
18  McClure stopped selling AEG insurance?
19      A.  No.
20      Q.  So once McClure ceased selling AEG
21  insurance, Brimar ceased administering those
22  claims?
23      A.  I had a cease and desist order from the
24  State, as did McClure and Associates.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

---

25

1    Q.   You understood the cease and desist
2  order that you received to mean that you could no
3  longer administer claims also?
4    A.   I took it to mean I couldn't do anything
5  relative to the AEG program.
6    Q.   Is Brimar still receiving claims
7  involving AEG insurance?
8    A.   Receiving claims, are you talking about
9  incurred but not reported claims?  I'm not sure --
10 you have to define what -- when you're asking me
11 that question --
12   Q.   Okay.
13   A.   -- as to what you mean by receiving
14 claims.
15   Q.   If a -- well, I guess we'll come back to
16 that.
17         Were you in any way involved in the
18 selling of AEG insurance?
19   A.   I would be out on all proposals to
20 discuss the facet of the program we were
21 presenting, yes.
22   Q.   So you would accompany Mr. McClure in
23 those proposals?
24   A.   Any of the producers who we have here.

---

26

1    Q.   And what would your role be during
2  this -- the presentation process?
3    A.   Talk about the program, the way the
4  program was administered, the way the program
5  set up, the way I understood the total coverage
6  issues to be -- to be set in the eyes of the State
7  of Illinois.
8    Q.   My understanding from Mr. McClure is
9  that he dealt with a Mike Ward at AEG.  Does that
10 name sound familiar?
11   A.   Yes.
12   Q.   Have you ever met Mike Ward?
13   A.   Yes.
14   Q.   When did you first meet him?
15   A.   My first meeting with him was when he
16 was in a -- a risk manager for a company called
17 Elite Staffing.
18   Q.   Do you recall approximately when that
19 was?
20   A.   2/4, 2/5, something like that.
21   Q.   February of '05?
22   A.   No, '04 or '05, I'm not sure which year
23 it was.  We went in there to try to sell Elite
24 Staffing and he was the risk manager for Elite

---

27

1  Staffing.
2    Q.   Was he the person that recommended AEG
3  to you?
4    A.   Yes, he -- yes, he came in here after
5  our initial meeting and talked about AEG and the
6  ability for AEG/RCA to sell what I would call
7  non-traditional accounts such as staffing services,
8  roofing companies, more difficult non-standard
9  market risks.
10   Q.   I believe Mr. McClure testified that he
11 understood AEG to be offering a product for higher
12 risk clients.  Would that be a fair assessment?
13   A.   Non-standard, yes.
14   Q.   Do you know why McClure would recommend
15 AEG insurance to one of its client as opposed to
16 another insurance company?
17   A.   Well, the main reason, the reason I just
18 outlined, they were doing non-standard product.
19   Q.   So did you understand it to mean that
20 they would get a better rate through AEG than
21 somebody else?
22   A.   Not necessarily.  They could provide
23 coverage that some other carrier would not be
24 willing to provide because it was non -- non --

---

28

1  non-acceptable product to the mainstream industry.
2    Q.   Do you know approximately how many
3  worker's comp insurance carriers McClure placed
4  coverage for?
5    A.   How many policyholders we wrote --
6    Q.   No, I'm sorry, how many carriers did
7  McClure offer to its clients if they were looking
8  for worker's compensation insurance?
9        MR. SCOLARO:  Objection to the extent that
10 my -- Dave was not the -- privy to some of those
11 conversations, but to the extent that he knows the
12 answer to that question and can outline it, he can
13 go ahead and answer.
14 BY THE WITNESS:
15   A.   We would talk about the markets that we
16 had.  We had, you know -- we hold the contracts
17 with numerous markets, so we would talk about our
18 ability, if, in fact, we knew the market had the
19 potential to write that class of business, we would
20 talk about those companies.
21 BY MR. RICE:
22   Q.   And when you say "market", what do you
23 mean?
24   A.   Well, a market is the industry.  I mean,

---



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                        April 27, 2010

29

1  if I talk to you about the insurance market, I'm
2  talking to you about the industry as a whole, the
3  carriers within the market.
4      Q.   If I were a staffing company that came
5  to McClure and Associates to seek coverage for my
6  worker's compensation --
7      A.   Yes.
8      Q.   -- exposure?
9      A.   Yes.
10     Q.   Do you know the process in which it
11 would be decided that I would be placed with AEG
12 versus some other company, do you know that
13 process?
14     A.   It would be a case of us telling them
15 these are carriers that are involved in writing
16 that product, and these are the ones that we've had
17 the most success in placing business with and these
18 are the ones that are competitive in price range.
19     Q.   And do you know approximately how many,
20 you know, carriers offered worker's compensation
21 products that were in your pool of availability for
22 clients?
23     A.   For?
24     Q.   Four?  Do you know --

30

1      A.   No, I'm saying for what?  You've got to
2  be more specific.
3      Q.   Again, using my example, if I came in
4  here looking for worker's compensation insurance,
5  you said that you would tell this prospective
6  client that you had certain carriers that would
7  write that particular product; right?
8      A.   Yes, but you have to be specific to
9  product because all carriers don't write all
10 products.
11     Q.   And I'm using the product of worker's
12 compensation insurance.
13     A.   To the extent that I talk about a
14 product, I'm talking about your industry.
15     Q.   Okay.  So --
16     A.   So you would have to tell me what your
17 product is for me to tell you if the carrier would
18 be willing to write it.
19     Q.   So let's use my example as a staffing
20 company.
21     A.   Okay.
22     Q.   If I came to you looking for worker's
23 compensation for my staffing company, how many
24 different carriers would McClure and Associates

31

1  have to offer me?
2      A.   Then it would depend on the type of
3  program you wanted, it would depend upon the
4  of your premium, and so there are var -- there are
5  variables to carriers who will write your product
6  in your example.
7      Q.   Okay.  Do you have a finite number of
8  carriers you can use to write any product for, for
9  example, staffing companies?
10     A.   When you define finite, you mean
11 unlimited?
12     Q.   No, I mean -- there are certain carriers
13 McClure and Associates does not write business
14 correct?
15     A.   That's right.  You have to have a
16 contract to write business for them.
17     Q.   How many contracts do you have with
18 carriers that write worker's compensation
19 insurance?
20     A.   I would be guessing, but I would say
21 eight to ten.
22     Q.   And would that be the same number
23 approximately during -- that you had contracts
24 during the time frame in which McClure was

32

1  AEG business?
2      A.   Contracts but not contracts that would
3  write staffing services.
4      Q.   How many contracts did you have with
5  companies that wrote worker's compensation
6  insurance for staffing clients?
7      A.   Depending on the size -- again, I
8  would -- you know, this is a very limited question
9  that I could respond to because it isn't as simple
10 as saying you walk in the door and say I want
11 insurance and I'm a staffing service, you know.
12 There are qualifiers for every carrier, you know,
13 you'd have to tell me if you have drug testing, you
14 would have to tell me the size of your premium, you
15 would have to tell me the nature of your work.
16     In other words, some carriers will not
17 write staffing services that do heavy construction,
18 they won't write it if they do heavy industry.  I
19 mean, it varies.  So every question we would ask
20 you would be to determine who -- which carrier
21 would best fit your risk.
22     Q.   If you had, using your number, eight
23 contracts with eight clients -- or carriers that
24 could sell worker's comp insurance to anybody --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                      April 27, 2010

33

1    A.   Yes.
2    Q.   -- the questions you would be asking the
3 potential client would only narrow the number of
4 options you had available to you out of the eight?
5    A.   That's right.
6    Q.   So you're not going to go outside of the
7 eight you have because you don't have a contract
8 with them?
9    A.   Right, couldn't do it.
10   Q.   So that's what I wanted to know.
11   A.   Mm-hmm.
12   Q.   Because you were involved in the
13 presentation of AEG insurance to potential clients,
14 did you do any investigation yourself into the
15 solvency of AEG?
16   A.   Yes.
17   Q.   What investigation did you do?
18   A.   I called -- I called RCA -- as I
19 understood the program to be, AEG was a fronting
20 company for RCA.  And when I say "fronting
21 company," typically in this industry, a group of
22 investors will put up a certain amount of risk
23 money that they themselves will be responsible for
24 and there will be excess insurance over and above

34

1 that.  And it was my understanding that AEG was the
2 fronting company, that RCA was the excess carrier.
3 So I called RCA, I called a company called Monument
4 Insurance Agency, which was the agency that
5 supposedly put together RCA and AEG, and I also
6 called the Department of Insurance in the State of
7 Illinois.
8    Q.   Monument, is that what --
9    A.   Monument, yes.
10   Q.   Do you know where they're based out of?
11   A.   They were in New York.  The state, I
12 couldn't -- I mean, the city, I couldn't tell you.
13   Q.   Did you call RCA before any clients were
14 placed with AEG?
15   A.   No, I called them as -- we went into the
16 process -- I had heard rumors to the effect that
17 there may be some issues with the relationship
18 between RCA and AEG, and I wanted to check on those
19 issues to determine if there was any credibility to
20 those.
21   Q.   Okay.  So your investigation into the
22 solvency of AEG and RCA --
23   A.   I don't think "solvency" is the right
24 word.  The relationship is what I was checking on.

35

1    Q.   Well, my question originally was did you
2 do any investigation into the solvency of AEG?
3    A.   I did investigation into the
4 relationship between AEG and RCA.
5    Q.   And that rela -- that investigation that
6 you performed occurred after you heard some
7 that possibly there might be some problems
8 their relationship --
9    A.   That's right.
10   Q.   -- RCA and AEG; correct?
11   A.   Yes.
12   Q.   Okay.  And obviously, that investigation
13 occurred after McClure had already started placing
14 clients with AEG; right?
15   A.   Which is standard in the industry.  If a
16 carrier walks in the door, you don't typically do a
17 background check on the carrier.  There's an
18 assumption of professionalism in the industry that
19 if somebody is presenting you with a product and
20 presenting you with a carrier, that they're a
21 legitimate admitted carrier to the State of
22 Illinois.
23   Q.   Do you know who you spoke with at RCA
24 when you called them?

36

1    A.   Didn't speak with anybody because they
2 never returned my call.
3    Q.   Did you ever write them?
4    A.   No.
5    Q.   You said you also contacted a company
6 call Monument; correct?
7    A.   Yes.
8    Q.   And that was after you tried to call
9 RCA?
10   A.   That's right.
11   Q.   And did you ever speak with anyone at
12 Monument?
13   A.   No, they never returned my call.  I left
14 voicemail messages with them on numerous
15   Q.   Do you know who you called?
16   A.   It was -- who I called directly, no.  I
17 was calling Monument to see if they could direct
18 to the person who was handling the AEG/RCA
19 relationship.
20   Q.   And did you ever follow up with them in
21 writing?
22   A.   No.
23   Q.   And then finally, you said you contacted
24 the Department of Insurance; correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

---

**37**

1    A.   That's right.

2    Q.   And this was after your calls to RCA and

3  Monument were unreturned?

4    A.   That's right.

5    Q.   Okay.  And did you end up speaking with

6  anyone at the Department of Insurance?

7    A.   Yes.

8    Q.   Do you know who you spoke to?

9    A.   Name, I do not recall.  He identified

10  himself as the chief investigator for the

11  Department of Insurance.

12    Q.   Do you recall approximately when you

13  spoke to him or her?

14    A.   You mean the year and the date?

15    Q.   Approximately.

16    A.   '07, mid -- early, January, February,

17  maybe late of '06, something in that time frame.

18    Q.   So sometime '06 to '07?

19    A.   Mm-hmm.

20    Q.   Do you recall the substance of your

21  conversation with them?

22    A.   Yes.

23    Q.   What was the substance?

24    A.   It was very basic and very brief, any

---

**38**

1  issues between RCA and AEG, any problems that the

2  State has seen between the two of them.

3    Q.   And what was the response?

4    A.   No.

5    Q.   So the Department of Insurance told you

6  back in 2006/07 that there were no problems between

7  RCA and AEG?

8    A.   That's right.  I then followed with a

9  letter to the Department of Insurance that would

10  confirm our conversation and I never received a

11  response back.

12    Q.   So you sent them a letter?

13    A.   Yes.

14    Q.   Okay.  Did you retain a copy of that

15  letter?

16    A.   Yes.

17    MR. RICE:  I'm not sure if it's been produced,

18  but if it has --

19    MR. SCOLARO:  I'm 90 percent sure it has, but

20  if you don't have a copy, sure, we can certainly do

21  that.  I believe it also might be an exhibit to the

22  counterclaim but I'm not quite sure.

23    MR. RICE:  Okay.

24    ///

---

**39**

1  BY MR. RICE:

2    Q.   During the course of discovery in this

3  case, a certificate of insurance was produced

4  relating to -- purportedly relating to an insurance

5  policy that RCA had issued above and beyond the

6  insurance.  Are you familiar with that certificate?

7    A.   I am.

8    Q.   Okay.  What did you understand that

9  certificate to represent?

10    A.   Exactly as I outlined earlier, that

11  there was an excess carrier and a funnel carrier.

12    Q.   Okay.  Did you do any investigation into

13  the certificate of insurance, meaning did you

14  contact RCA to request a copy of the insurance

15  policy that was identified on the certificate?

16    A.   I've already answered that. I called

17  RCA and I called -- I called RCA and Monument

18  relative to that issue.

19    Q.   Well, you had indicated earlier that you

20  contacted RCA to discuss a potential problem

21  between RCA --

22    A.   That was the problem.

23    Q.   What was the problem?

24    A.   The problem that I was not certain that

---

**40**

1  there were not issues.

2    Q.   Between their relationship?

3    A.   That's right.

4    Q.   Okay.  When did you get the certificate

5  of insurance?

6    A.   I don't recall that.

7    Q.   So your conversation to RCA after you

8  heard rumors about a potential problem was

9  investigate the relationship between them two and

10  part of that investigation was to follow up on what

11  was said on the certificate?

12    A.   Yes.  Well, that was the premise of it.

13    Q.   Okay.  And the premise being you wanted

14  to make sure there was insurance?

15    A.   The premise was that there was a

16  legitimate certificate and a legitimate

17  relationship.

18    Q.   Were you in any way involved in

19  determining AEG's A.M. Best rating?

20    A.   AEG was the fronting company, they would

21  not have had a rating.

22    Q.   How about a rating for RCA?

23    A.   RCA was the excess carrier and I never

24  made contact with them, as I just indicated.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                      April 27, 2010

---

41

1    Q.   So the answer is you did not verify
2  their A.M. Best rating; correct?
3    A.   No.
4    Q.   Okay.  And you would not have verified
5  it prior to writing the business with AEG; correct?
6    A.   Writing the business with whom?
7    Q.   AEG?
8    A.   Well, they were one and the same.  There
9  were not two different entities, they were one and
10  the same.
11    Q.   My question is -- McClure started
12  writing AEG business sometime in, I believe we said
13  2005/06 to May of '07?
14    A.   That's right.
15    Q.   Were you involved in any way in
16  verifying RCA's A.M. Best rating before that
17  business was written?
18    A.   I myself, no.
19    Q.   I'm sure you're familiar with the
20  Illinois Insurance Guaranty Fund; correct?
21    A.   Yes.
22    Q.   Did you believe in any way that the fund
23  would step in to pay claims made involving AEG
24  after AEG became insolvent?

---

42

1    A.   Yes, because RCA was an admitted
2  carrier, and the admitted carrier in the State of
3  Illinois has to pay boards and bureaus, which go to
4  the Guaranty Fund.
5    Q.   Okay.  And did you ever receive a
6  response from the Guaranty Fund with respect to
7  these claims?
8    A.   After the fact?
9    Q.   After AEG become insolvent.
10    A.   No, we received a -- our conversations
11  were all with the office of the special deputy.  I
12  am not certain if they're connected with the
13  Guaranty Fund or not, but it was the office of the
14  special deputy who was involved from that point on.
15    Q.   Okay.  And when you say "that point on,"
16  you mean from after they became insolvent?
17    A.   After May of '07, when the office --
18  when the Department of Insurance came in and said
19  we have a cease and desist order.
20    Q.   Have you ever had any contact directly
21  with the Guaranty Fund?
22    A.   Not the Guaranty Fund, only the office
23  of the special deputy.
24    Q.   You had mentioned that you caught word

---

43

1  of a potential problem with AEG and RCA, which
2  provoked you to contact RCA to verify that; right?
3  Do you know how you became aware of that problem?
4    A.   It was just a -- it was more of a
5  discomfort level on my part.  I was not comfortable
6  with questions I would ask Mr. Ward and his
7  responses, so I decided to do a due diligence on my
8  part by making the phone calls to the people who
9  were primary to any insurance operation, which
10  would have been the carrier, the agency and the
11  State.
12    Q.   And do you recall when that level of
13  discomfort set upon you?
14    A.   It was created during the period of time
15  in our relationship, it was an ongoing thing.
16    Q.   Okay.  So was this during the time
17  period in which AEG business was still being
18  written by McClure?
19    A.   Yes.
20         (WHEREUPON, a certain document
21          was marked Ciarrachi Deposition
22          Exhibit No. 1, for identification,
23          as of April 27, 2010.)
24    ///

---

44

1  BY MR. RICE:
2    Q.   Mr. Ciarrachi, I'm showing you what's
3  been marked as Exhibit 1 for your deposition.  Take
4  a moment to look at that and let me know when
5  you're finished.
6    A.   Mm-hmm.  I'm familiar with the basic
7  premise of this.
8    Q.   Okay.  So my first question is do you
9  recognize Exhibit 1?
10    A.   Yes.
11    Q.   And do you know what it is?
12    A.   It's a cease and desist.
13    Q.   Okay.  Is it the cease and desist order
14  that you talked about earlier from the -- that you
15  received?
16    A.   Yes.
17    Q.   You'll see on Page 1 of Exhibit 1, there
18  are four entities listed in the "To" box.  Do you
19  see that?
20    A.   Yes.
21    Q.   Okay.  I'm obviously familiar with
22  Mr. McClure and McClure and Associates.  Again,
23  there's the Brimar Industries, that was the sole
24  proprietorship?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                                    April 27, 2010

45

1    A.  I have no idea what that is.
2    Q.  Okay.  No idea what that is.
3        And then Brimar Claims Administrative
4    Company, again, I assume you --
5    A.  We've talked about that.
6    Q.  Is that just a misnomer on the part of
7    the State?
8    A.  I have no idea.  I didn't prepare this
9    document, I received the document.
10   Q.  Okay.  Brimar Administration has never
11   gone by Brimar Claims Administrative; correct?
12   A.  Brimar Claims Administrative Company, is
13   that what you're asking me about or Brimar
14   Industries?
15   Q.  We know Brimar Industries never existed,
16   right, Or you don't know about it?
17   A.  I don't know anything about it.
18   Q.  Okay.  What about Brimar Claims
19   Administrative Co.?
20   A.  Yes, that's what we've talked about
21   earlier in our conversation.
22   Q.  You mentioned earlier Brimar
23   Administration, LLC.  Is that the same thing?
24   A.  Same thing.

46

1    Q.  Did Brimar Administration ever go by
2    that name, Brimar Claims Administrative Co.?
3        MR. SCOLARO:  Objection:  Asked and answered,
4    but to the extent that my client knows the
5    difference between the two, if there is a
6    difference, he can go ahead and answer.
7    BY THE WITNESS:
8    A.  I don't know the difference between the
9    two.  I assume they were the same thing.
10   BY MR. RICE:
11   Q.  If you take a look at Page 4 of
12   Exhibit 1, in the middle of the page, the document
13   dated July 5th of 2007, do you see that?
14   A.  Yes.
15   Q.  Do you believe you received this
16   document at or around that time?
17   A.  I couldn't tell you for sure.  There's
18   no way that I could tell you that.
19   Q.  Okay.  And do you have any independent
20   recollection of when you received this document?
21   A.  No, but I do recall receiving it.
22   Q.  Okay.  What did you understand Exhibit 1
23   to mean?
24   A.  Exactly what it said, not -- not to do

47

1    anything relative to the AEG/RCA program.
2        I, furthermore, had a discussion with
3    the office of the special deputy about -- and maybe
4    I should ask you first without -- what I'm about to
5    say because I'm not certain --
6        MR. SCOLARO:  Well, I would just -- answer the
7    question to the best of your recollection.  To the
8    extent it involves any conversations that you and I
9    have had --
10       THE WITNESS:  It wasn't a conversation --
11   Jeff, you weren't even involved at that time.
12   BY THE WITNESS:
13   A.  But we met with the office of the
14   special deputy.  I requested a meeting with them.
15   We discussed a myriad of cases and we said, "How
16   should we go about these cases."
17       We presented numerous options that we
18   felt we needed to move forward with, and the
19   premise was to try to limit the damages, because
20   from day one in insurance, the obligation of the
21   insured is to limit the damages, which is what
22   we -- our attempt was in meeting with the office of
23   the special deputy.  We presented special --
24   specific options to them.

48

1        We specifically talked about Genie
2    Temporary Services because there was a case that
3    had been heard, had an award made to a gentleman,
4    and we wanted to go into that specific discussion.
5    The arbitrator had affixed penalties on top of the
6    award.  And we said to them, "You understand that
7    this is a building claim and we're under a cease
8    and desist and, thus, we can do nothing about it?"
9    BY MR. RICE:
10   Q.  Okay.  So this conversation that you
11   just mentioned with the Department of Insurance --
12   A.  Yes -- not with the Department of
13   Insurance, with the office of the special deputy.
14   Q.  That occurred after you received the
15   cease and desist order?
16   A.  Yes.
17   Q.  Okay.  And what was the resolution or
18   the recommendation given to you after you had this
19   conversation?
20   A.  Specifically about the Genie case?
21   Q.  Yes.
22   A.  I was told to forward the Genie case to
23   the office of the special deputy and that they
24   could go to the courts and get the penalties



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                April 27, 2010

49

1  removed.
2     Q.  Okay.  And do you know if that ever
3  happened?
4     A.  That it was forwarded or that they had
5  it removed?
6     Q.  Both.
7     A.  It was forwarded.  Did they have them
8  removed, I have no idea.
9     Q.  Did you discuss with the special deputy
10  how to process or handle any claims in addition to
11  the one you just spoke about with Genie?
12     A.  We had a discussion about the fact that
13  we had to protect our reputation.  We've been in
14  business 20-plus years and we were concerned
15  the damages to our reputation in terms of our loss
16  of business.  And so the discussion with the office
17  of the special deputy is, you know, "Do you have an
18  objection to us moving forward and working with our
19  insureds who had outstanding claims to try to
20  resolve those?"
21     Q.  Okay.  My understanding from talking
22  with Mr. McClure is that at some point, there was
23  money held by McClure and Ciarrachi or McClure
24  Associates or Brimar to the tune of approximately

50

1  $1.3 million?
2     A.  That's right.
3     Q.  That money was eventually turned over to
4  the special deputy; correct?
5     A.  That's right.
6     Q.  Were you -- was it your intention to use
7  those funds to pay claims?
8     A.  We called the Department of Insurance
9  first to receive -- this money that he's speaking
10  about is insurance premiums that we had received
11  from our policyholders.
12     Q.  Okay.
13     A.  So we called -- and as you know,
14  premiums should go in your premium trust account.
15     Q.  Right.
16     A.  So we asked them permission to put it in
17  a separate account because we were concerned
18  commingling AEG premiums with our premium trust
19  account.  And we received permission to do that,
20  and the objective initially was that that money
21  would be used then to pay down claims that had
22  existed for our policyholders.
23     Q.  Okay.  I still don't know how the money
24  accumulated that much --

51

1     A.  From the premiums from the insureds that
2  we had written under the AEG program.
3     Q.  When -- okay, so just so I'm clear, we
4  had a year period, approximately a year period
5  where McClure was writing AEG business; okay?
6     A.  That's right.
7     Q.  During that time period, policy premiums
8  were paid directly to McClure; right?
9     A.  That's right.
10     Q.  Okay.  McClure would then deposit those
11  funds into its client trust account?
12     A.  That's right.
13     Q.  And then the money over time accumulated
14  to this 1.4 million?
15     A.  No.  The money that we're talking about
16  was segregated money after the cease and desist
17  after the issues with the State developed, it was
18  money that that perhaps two-month period of time,
19  that that specific time frame money.
20     Q.  Okay.  So the money that was collected
21  by McClure and Associates during the year in which
22  there didn't seem to be a problem with AEG --
23     A.  That's right.
24     Q.  -- that money would be forwarded on to

52

1  AEG as just any other premium would to a carrier;
2  right?
3     A.  Yes.
4     Q.  Okay.  It wasn't until the cease and
5  desist order came down that you had a window now of
6  time where the cease and desist order and this
7  two-month period where you were collecting premiums
8  but you didn't have anybody to give it to?
9     A.  Well, we could have given it to AEG.
10     Q.  Right.  But you chose not to do that?
11     A.  We chose not to do that.
12     Q.  So at some point, then, you had this
13  $1.4 million and then you just gave it back to the
14  special deputy; right?
15     A.  Not willingly, at their request.
16     Q.  Do you know what happened with that
17  money?
18     A.  No idea.
19     Q.  Okay.  Do you ever get reports from the
20  special deputy?
21     A.  No.
22     Q.  Okay.  Have you made any contacts
23  yourself with the special deputy since the time in
24  which the money has been released?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                      April 27, 2010

53

1     A.    Many.
2     Q.    Okay.  And what has been your general
3   response from them?
4     A.    None.
5     Q.    Do you try to call them?
6     A.    Call them, write them.
7     Q.    Okay.  And you've gotten zero response
8   from them?
9     A.    Exactly.
10     Q.    Okay.
11     A.    And we've also worked with our attorneys
12   to do the same thing.
13     Q.    Okay.  Do you know how many policies
14   McClure and Associates issued involving AEG a
15   prior to the cease and desist order?
16     A.    No.
17     Q.    Were you aware of any problems with AEG
18   and RCA between the time in which you were
19   convinced after calling the Department of
20   Insurance -- strike that for a second.  Start over.
21         You talked about your own suspicions
22   that you tried to relieve by contacting RCA,
23   Monument and then finally the Department of
24   Insurance.  You spoke to the Department of

54

1   Insurance, they said there was no problem, so you
2   went about your business and then, lo and behold,
3   here comes the cease and desist order; right?
4     A.    No, person from the Department of
5   Insurance came into the office.
6     Q.    Okay.  So there's somebody -- there was
7   something that happened in between you convincing
8   yourself that everything was okay and then, lo and
9   behold, there was a problem, i.e., the cease and
10   desist order?
11     A.    That's right, yes.
12     Q.    What was that event?
13     A.    A person from either the office -- it
14   was either from Department of Insurance or the
15   office of the special deputy came in here and told
16   us that they had been investigating the RCA/AEG
17   relationship.
18     Q.    And do you know approximately when that
19   person came to the office?
20     A.    Sometime in May of '07.
21     Q.    May of '07.  Okay.
22         So if -- using the date that's on
23   Exhibit 1, which I believe was July of '07?
24     A.    July 5th of '07.

55

1     Q.    So about approximately two months before
2   they issued a cease and desist order, somebody
3   comes here to tell you there's a problem?
4     A.    That's right.
5     Q.    Okay.  Prior to the individual coming to
6   your office in May of '07, did you have any
7   inclination that there was a problem with RCA and
8   AEG?
9     A.    Well --
10     MR. SCOLARO:  Objection to the extent it was
11   asked and answered.
12   BY THE WITNESS:
13     A.    I've answered that question.  I -- by
14   contacting the State of Illinois, they specifically
15   told me there wasn't.
16   BY MR. RICE:
17     Q.    Okay.  And I apologize, my question then
18   is from the time that you convinced yourself that
19   there was no problem by contacting the Department
20   of Insurance to the time when somebody came here
21   and told you there was a problem, you had no
22   indication in between that period; right?
23     A.    No.  As a matter of fact, I had
24   alleviated my fears by having the Department of

56

1   Insurance telling me that there weren't problems.
2         (WHEREUPON, a certain document
3          marked Ciarrachi Deposition Exhibit
4          No. 2, for identification, as of
5          April 27, 2010.)
6   BY MR. RICE:
7     Q.    Mr. Ciarrachi, I'm showing you what's
8   been marked as Exhibit 2 for your deposition.
9   take a moment to look at that and let me know
10   you're finished.
11     A.    I'm familiar with it.
12     Q.    Okay.  So that's my question, do you
13   recognize the document?
14     A.    Yep.
15     Q.    Okay.  And what is it?
16     A.    Stipulation and consent order.
17     Q.    Did you receive a copy of this document?
18     A.    Yes.
19     Q.    Is that your signature on Page 5 of
20   Exhibit 2?
21     A.    One of them.
22     Q.    Do you recognize any other signatures on
23   Page 5?
24     A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI      April 27, 2010

57

1   Q.   Which signature?

2   A.   Brian McClure, Barbara Gast.

3   Q.   Okay. And is that your signature next

4 to Brimar Investigations, LTD?

5   A.   Yes.

6   Q.   What did you understand Exhibit 2 to

7 mean when you signed it?

8   A.   To present to the office -- to -- to

9 the -- I take it this was to the Department of

10 Insurance -- or actually, it was -- our dealings

11 were always with the office of the special deputy,

12 despite the fact that this came from the Department

13 of Insurance, to provide to them the itemizations

14 that they requested on Page 3 of this document.

15      They sent a -- the office of the special

16 deputy sent a person in here who was in here about

17 six or seven weeks looking through AEG files.

18   Q.   Okay. So is it fair to say that the

19 document, Exhibit 2, which you signed, was

20 essentially laying out the things you agreed to do

21 in connection with the Department's investigation?

22   A.   Yes. That's the way I took it anyway.

23   Q.   So Items 1 through 8 listed on Page 3 of

24 Exhibit 2 are the things that McClure and Brimar

58

1 were to do in connection with the investigation?

2   A.   Mm-hmm.

3   Q.   Whether it be not doing something or

4 doing something to help them?

5   A.   Yeah, mm-hmm.

6   Q.   What did you do when you -- strike that.

7      Did you work with the Department to

8 create this document or did they just create it and

9 send it to you?

10   A.   They created it and sent it to me.

11   Q.   Did they have any conversations with you

12 about it when you signed it?

13   A.   No.

14   Q.   Okay. Was it something that was just

15 mailed to you, you signed it and returned it?

16   A.   I don't know if it was mailed or if it

17 was brought by a special deputy, I don't recall,

18 but I do remember receiving it. How, I don't know.

19   Q.   Before you signed it, did you discuss

20 the document with anybody?

21      MR. SCOLARO: Objection to the extent it calls

22 for disclosure of attorney-client privileged

23 conversations and/or documents.

24      But to the extent it doesn't, you can

59

1 answer the question.

2 BY THE WITNESS:

3   A.   I don't recall. I mean, we had another

4 attorney involved initially before the Scolaro

5 firm, Jeff got involved, so we may have discussed

6 it with them, I don't recall.

7 BY MR. RICE:

8   Q.   Did you have any conversations with

9 Mr. McClure about it?

10   A.   To the specific -- I imagine I did, but

11 I could not specifically tell you that there was a

12 time or place.

13   Q.   I want to talk just briefly about the

14 claims -- do you want to take a break? I'm sorry.

15      THE WITNESS: I do, I'd like to go to the

16 washroom.

17      (WHEREUPON, a short break was

18      taken.)

19 BY MR. RICE:

20   Q.   Before we took a break, I just wanted to

21 ask you some questions about AEG claims

22 Do you know approximately how many claims had

23 made involving AEG?

24   A.   No.

60

1   Q.   Okay. I was fortunate enough to come

2 here on Friday and look at a number of bankers

3 boxes, some of them which are in the room right

4 now, which I understand to be boxes that contain

5 all of the claim files that had been submitted --

6 or all of the claims that had been submitted that

7 involve AEG insurance. Do you understand that to

8 be true with what's in these boxes?

9   A.   No, I have no idea what's in the boxes,

10 I wasn't involved in that.

11   Q.   This is not something that Brimar would

12 take care of?

13   A.   No -- well, I mean, the producers

14 probably put these in there because the way we

15 ultimately decided to go about resolving

16 outstanding cases was that each producer would

17 contribute towards any settlements that were made

18 on behalf of the claims that were presented in the

19 AEG program by our agency directly.

20   Q.   After the cease and desist was entered,

21 Brimar and/or McClure received claims involving AEG

22 insurance; is that fair?

23   A.   Yes.

24   Q.   Okay. There was a time period when



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

61

1  you're receiving these claims that you felt you
2  couldn't do anything with them because your hands
3  were tied by the government; right?
4      A.  We had a cease and desist.
5      Q.  Okay.  It's my understanding, though, at
6  some point, Brimar and/or McClure elected to start
7  paying these claims directly; is this accurate?
8      A.  After they released the cease and desist
9  order.
10     Q.  And do you know when that release
11 occurred?
12     A.  No.
13     Q.  Okay.  Do you know approximately -- do
14 you have any recollection of when the first claim
15 was paid directly by Brimar and McClure and
16 Associates?
17     A.  Let me back up a minute.  When we had
18 the office of the special deputy in here, we had
19 reached a verbal agreement with them that we will
20 be able to pay off of that $1.5 million that we had
21 given them claims for the AEG/RCA program.
22     Q.  Okay.
23     A.  In the middle of their presence here,
24 and I want to say two or three weeks into it, the

62

1  person who represented the office of the special
2  deputy received a phone call from his supervisor,
3  and they said do not send any of those checks out,
4  they could not be paid.
5      Q.  Okay.  So -- and again, I'm just trying
6  to understand the timeline, the cease and desist
7  order happens.
8      A.  Yes.
9      Q.  You're holding onto funds because you
10 have these people paying for premiums that you're
11 not going to send over to AEG; right?
12     A.  That's right.
13     Q.  At some point, you have a conversation
14 with the special deputy and they say, "We're going
15 to allow to you make payments to claims that are
16 coming in using those premiums;" correct?
17     A.  That's right.
18     Q.  And then at some point after that, they
19 say, "No more, give us the money, we don't want you
20 making any payments and any of the checks you
21 wrote, we're not cashing them"?
22     A.  We actually -- I think we still got
23 copies of the checks we wrote, but they never were
24 sent out because they said at that point, "You

63

1  cannot send these checks out."
2      Q.  Okay.  So the best of your knowledge, no
3  claims were paid out of money that was eventually
4  turned over to the government; right?
5      A.  By us, no.
6      Q.  Okay.  During that time period where you
7  were sending out checks -- or that you were going
8  to make payments but you decided not to send out
9  the checks because they told you not to, did you
10 ever end up writing personal checks to cover those
11 expenses?
12     A.  No, not during that period of time.
13     Q.  Okay.  After the government seized the
14 money, the premium money, did McClure and
15 Ciarrachi, the funnel account, start making
16 payments to claims?
17     A.  After we had the cease and desist order
18 removed, we started paying claims, yes.
19     Q.  Okay.  And you do not recall when that
20 was?
21     A.  No, I don't know.
22     Q.  Okay.
23     A.  And I may add here that the reason we
24 made those payments was to limit damages.

64

1      Q.  Okay.  Who within this office is in
2  charge of handling these claims as they come in,
3  AEG claims?
4      A.  You mean now or then?
5      Q.  Let's do now first.
6      A.  Well, I would see the majority of them,
7  I'd probably see all of them, as a matter of fact.
8      Q.  Okay.  When I looked at these boxes that
9  are in the room right now, these are documents that
10 were produced by McClure and Associates and/or
11 Brimar as claim files involving AEG.  When I look
12 at the boxes, I see that on the outside of them
13 some of them are marked what I believe to be --
14 might be overall clients.  So you have like a PTO,
15 you have Genie, you've got -- I know there's some
16 cab company boxes back there, too.  Do you know
17 approximately how many clients, and when I say
18 "clients," I mean just a company, AEG business was
19 placed with?
20     A.  No.
21     Q.  Okay.  Do you think that number is
22 smaller than 10?
23     A.  It would be larger than 10.
24     Q.  Okay.  I think the number was about 25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

                                                      65

1  that I heard before.  Does that sound about right?
2      A.   I wouldn't know.
3      Q.   Okay.  Are you still receiving AEG
4  claims today?
5      A.   I want to say rarely.  I mean, there may
6  be an isolated incident where you'll see that
7  happen.  But, typically, as you know, workers'
8  compensation has a statute of limitations, and the
9  statute of limitations for AEG business would have
10  expired.
11     Q.   Okay.
12     A.   So if, hypothetically, a claim were out
13  there under that coverage term, statute of
14  limitations would have expired and they would not
15  be able to present a claim.
16     Q.   Okay.  So I know that when Mr. McClure
17  was deposed, he talked about after the cease and
18  desist order, there was an effort by McClure and
19  Associates to either get new policies in place from
20  a company, I think Dallas National, to either pick
21  up where certain policies were to terminate or just
22  switch the business over to them?
23     A.   Which we did.
24     Q.   Okay.  So at this point, we're starting

                                                      66

1  to hit the bookend of any claims that could come in
2  involving AEG because the workers' compensation
3  statute of limitations would basically prevent
4  those people from making claims?
5      A.   Are you talking about today?
6      Q.   Today, correct.
7      A.   Yes.
8      Q.   Okay.  So it's fair to say that we're
9  hopefully on the back end of any new claims coming
10  in; right?
11     A.   Hope so.
12     Q.   Okay.  So any claims that had been made
13  to you during the time period of the cease and
14  desist order until this bookend we hope we're at,
15  the claim files would be here; right?
16     A.   Yes.  Well, either here or with the
17  office of the special deputy.
18     Q.   Are there certain claims that Brimar
19  forwarded directly on to the office of special
20  deputy?
21     A.   We forwarded all of them, I believe.
22     Q.   Okay.  So when I look at these claim
23  files that are sitting here, are these the
24  originals and you made copies and sent them to the

                                                      67

1  special deputy?
2      A.   About four times.
3      Q.   Okay.  So you believe what is in your
4  office, you have a duplicate of what the special
5  deputy should have?
6      A.   Yes.
7      Q.   Okay.  And all I'm trying to understand
8  is there aren't two or three claims that were so
9  enormous that you didn't even handle on your own,
10  you just sent them right away?
11     A.   I don't believe so, no.  I mean, our
12  attempt originally would have been to negotiate out
13  a claim that we felt we could handle, except for
14  the Genie-Ramirez claim.  Because of the penalties
15  that had accumulated on that claim, we were told to
16  send that one to the office of the special deputy
17  and that they would have the ability to take that
18  to the courts to have the penalties removed, which
19  in my opinion and my opinion only, should never
20  have been put on that case by the arbitrator
21  because we were under a cease and desist order at
22  that time.
23     Q.   And to the best of your knowledge,
24  nothing has been done about that; correct?

                                                      68

1      A.   That's right.  It's my understanding
2  that what was done about it is that the owner of
3  Genie was advised by counsel out of Florida that he
4  had an obligation to pay the total verdict of that
5  claim and that he did, in fact, do that.  And now
6  he is proceeding in litigation against us for the
7  total amount of monies.
8      Q.   Okay.  After the money was turned over
9  to the special deputy, the 1.4 million premium
10  money --
11     A.   Yes.
12     Q.   -- at some point, you and Mr. McClure
13  decided that you were going to start mitigating
14  your damages by paying money directly out of the
15  funnel account; correct?
16     A.   That's right.
17     Q.   We don't know what date that is, but a
18  decision like that was made at some point?
19     A.   It was.
20     Q.   Okay.  Do you know, why was that
21  decision made to do that?
22     A.   To limit our damages, the Ramirez case
23  being a case in point.
24     Q.   Okay.  So the purpose of paying these



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                April 27, 2010

69

1   claims directly out of your own personal funds was
2   in an effort to reduce those claims before they got
3   too large?
4        A.   Yes, and also to protect our reputation.
5        Q.   When the business -- well, strike that.
6             Did McClure and/or Brimar have any
7   contracts with any of these clients wherein there
8   was an agreement to pay these claims in the event
9   the carrier become insolvent?
10       A.   No, but as an agency, when we sell a
11  product, we're selling a promise to produce payment
12  of a claim when presented, so --
13       Q.   Okay.
14       A.   And it was our attempt to fulfill that
15  promise.
16       Q.   Okay.  This was not a written contract,
17  though?
18       A.   No.
19       Q.   Okay.
20       A.   Let me just go into that for just a
21  second because when you talk about a written
22  contract, an insurance policy is a written
23  contract, we would have had an insurance policy
24  with them, which basically would have said we're

70

1   going to honor and pay claims when they're
2   produced?
3        Q.   Okay.  Are you aware of that
4   being spelled out in any of the policies you've
5   ever written?
6        A.   I think it's in every policy written.  I
7   mean, your auto policy, your homeowner's
8   every policy written says in case of accident
9   and/or incident, you will make payment for --
10  the carrier, will make payment for.
11            In this case, the carrier was listed as
12  insolvent, so we, as an agency, felt a moral
13  obligation and a business obligation to make
14  payment.
15       Q.   Okay.  And those are the same
16  Mr. McClure used during his deposition, a
17  obligation to make these payments.  All I'm
18  to confirm is that there isn't any written
19  wherein you had a signature with the client
20  "We will pay this in the event AEG doesn't
21  claim"?
22       A.   There is always a written obligation
23  when you issue a policy to make payment for
24  when presented, in an insurance policy.

71

1   what you're receiving premium for.  It's a --
2   theoretically, it's a promise put on paper because
3   basically insurance is only selling a promise, you
4   promise to pay.
5        Q.   And I appreciate your answer.  What I'm
6   asking you, though, is that promise generally flows
7   from the carrier to the insured?
8        A.   That's right.
9        Q.   You don't have a separate contract,
10  Brimar or McClure, with the insured to make those
11  payments; is that correct?
12       A.   No, that's right.
13            (WHEREUPON, a certain document was
14            marked Ciarrachi Deposition Exhibit
15            No. 3, for identification, as of
16            April 27, 2010.)
17  BY MR. RICE:
18       Q.   Mr. Ciarrachi, I'm showing you what's
19  been marked as Exhibit 3 to your deposition.  Just
20  take a moment to look at it and let me know when
21  you're finished.
22       A.   I'm familiar with the document, yes.  I
23  mean, a letter like this was sent probably to all
24  of the medical providers that were involved in

72

1   workers' compensation claims.
2        Q.   Okay.  So you do recognize it?
3        A.   Mm-hmm, yes.
4        Q.   Okay.  And you indicated that Exhibit 3
5   is a document that would generally be sent to
6   medical providers for any of the claimants that
7   submitted claims involving workers' comp; is this
8   accurate?
9        A.   Yes.
10       Q.   Would Exhibit 3 have been prepared at or
11  near the time that it's dated at the top of Page 1?
12       A.   I would imagine.
13       Q.   Okay.  And why was this document
14  prepared?
15       A.   To inform the medical provider as to
16  what was going on.
17       Q.   And when you say "what was going on,"
18  what do you mean?
19       A.   That there was a cease and desist and
20  the issues that had developed with the State, the
21  office of the special deputy, AEG and RCA.
22       Q.   Okay.  Who would typically prepare this
23  document?
24       A.   Could be the producer, could be myself,



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

DAVID A. CIARRACHI                                          April 27, 2010

73

1  could have been Brian McClure.
2      Q.  Okay.  Is this a -- is Exhibit 3 a --
3  like a form letter?
4      A.  No -- well, somewhat.  I mean, it --
5  pretty much this is the language used but you could
6  change maybe one or two words in there.  As an
7  example, Christopher Jones would not be -- you
8  know, it might be -- here he's listed as the
9  patient with a Social Security number and the
10  account number, and those obviously would change.
11  Who it was sent to would obviously be changed.  But
12  the crux of the actual correspondence probably
13  would be consistently the same.
14      Q.  Okay.  In the letter, Exhibit 3, there's
15  a few names I just want to ask you who they were.
16  Jeff Heller, do you recognize that name?
17      A.  Yes.
18      Q.  Who is that?
19      A.  A producer.
20      Q.  And he's a producer that works for
21  McClure?
22      A.  That's right.
23      Q.  He does not work for Brimar?
24      A.  No, he does not.

74

1      Q.  Does he still work for Mr. McClure?
2      A.  Yes.
3      Q.  Bill Wall, do you recognize that name?
4      A.  Yes.
5      Q.  Who is he?
6      A.  A producer.
7      Q.  Does he still work with Mr. McClure?
8      A.  Yes.
9      Q.  Do you recall ever getting a response to
10  Exhibit 3 from Will County Medical Associates?
11      A.  I wouldn't -- there were so many of
12  these, I couldn't tell you specifically if we did
13  or we didn't.
14      Q.  Okay.  As a general matter, do you
15  recall getting responses of this type of letter?
16      A.  Me, specifically?
17      Q.  Yes.
18      A.  There would be times I would, there
19  would be times I wouldn't.  We ultimately turned
20  over all of the medical bills to a resolution
21  company for negotiation, and based on their
22  personal contacts -- when I say "personal," I'm
23  talking about telephonic contact, with the medical
24  provider, we paid on their resolution of the dollar

75

1  value to the medical that was performed to the
2  given patient.
3      Q.  Okay.  Are you still sending out letters
4  like this, Exhibit 3, to people?
5      A.  Hopefully not.  I mean, if we have, it's
6  when one of those isolated cases come in, but I'm
7  not aware of anything like this going on a regular
8  basis, no.
9      Q.  Okay.  This would be a letter you'd
10  contact at the inception of the claim just to let
11  them know that there's going to be some delays
12  involved in this because of this issue?
13      A.  That's right.
14      Q.  Again, based solely on the number of
15  tabs I see in these boxes, there's a significant
16  amount of claimants that have made claims
17  to AEG insurance.  Do you know how many of
18  claims are still open claims?
19      A.  As 100 percent -- I could only give you
20  percentages.
21      Q.  Okay.  Out of a percentage?
22      A.  Out of 100 percent of claims that would
23  have existed, I would say perhaps 90 percent
24  been resolved.

76

1      Q.  90 percent have been resolved?
2      A.  That's right.
3      Q.  I saw the name of what I believe to be
4  the company you talked about in terms that you
5  hired to help negotiate --
6      A.  Austin Resolution.
7      Q.  Austin Resolution.  And that was the
8  company you used for all of these?
9      A.  Yes.
10      Q.  Okay.  Do you have a list of all of the
11  claims that are closed and opened?
12      A.  I believe so.  I can't say that for
13  certainty.
14      Q.  Okay.  I know that I've been working
15  with your attorney to try to generate a list like
16  that.  Do you believe that you have the resources
17  available to make a list like that if you don't?
18      A.  You know, the way it would -- the way it
19  would happen -- the way I know the claims that --
20  the producers contribute, as I said.  Our
21  bookkeeper would, when they are given their
22  commissions on a monthly basis, reduce their
23  commissions by any monies they have paid
24  claims.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

**77**

1    Q.  Okay.
2    A.  So she would have those records, which
3  would tell you -- if a case was settled at the
4  Industrial Commission, there would be a contract
5  drawn up, which, of course, satisfies both the
6  respondent and the petitioner.
7    Q.  Sure.
8    A.  And that contract would exist within the
9  file or the statute of limitations would have run
10  on the file.  So for conclusion of a claim, one of
11  those two would have to exist.
12    Q.  Okay.  I notice that in my review of a
13  portion of these boxes, and again, there was, I
14  believe, 12 bankers boxes full of claims, in my
15  brief review of at least three boxes, I saw inside
16  of there generally a number that represented the
17  amount of outstanding medical bills.  And then
18  there would be on the inside sleeve of each file
19  jacket a list of checks that were written by
20  McClure and Ciarrachi, the check number, the
21  amount.  It was difficult for me to deduce whether
22  the claim was closed, whether the claim had been
23  settled for something less than the amount that
24  represented by the medical or the time -- you

**78**

1  lost time.
2      So my question to you before was is
3  there a way to calculate, one, whether the file was
4  closed or still open, and ultimately, the amount of
5  money that came out of this office to pay it?
6    A.  Yeah, well, we wrote out of our funnel
7  account ultimately the monies that we paid out, so
8  that calculation should be fairly easy to
9  determine.
10    Q.  Okay.
11    A.  As to whether a file is open or closed,
12  there's only two ways to do that in a workers' comp
13  file, the statute of limitations has run or if you
14  have a settlement for contract at the Illinois
15  Industrial Commission.
16    Q.  Okay.  And again, using your percentage,
17  you think there's maybe only about 10 percent left
18  that might still be lingering open?
19    A.  Yeah, there are one or two cab claims
20  that I feel are fraudulent that we are not
21  voluntarily paying and we're defending.
22    Q.  Okay.  I believe -- that's a good point.
23  I believe Mr. McClure also mentioned that, that
24  there are certain claims that have come in that you

**79**

1  may have concluded between you and Mr. McClure that
2  there was a -- it was a questionable claim; right?
3    A.  That's right.
4    Q.  And so you elected to retain counsel to
5  defend those claims; correct?
6    A.  That's right.
7    Q.  Okay.  And of the 10 percent that are
8  open, do you believe all 10 percent of those are
9  those types of claims?
10    A.  The majority of them, 98 percent of
11  them.
12    They're the ones that you're questioning
13  the legitimacy of the claim?
14    A.  That's right.
15    Q.  Aside from the money that came out of
16  the McClure and Ciarrachi funnel account, did you
17  receive any other funds from any other source to
18  help pay those claims?
19    A.  No.
20    Q.  And the money that's with -- that is
21  currently in or that was used to pay the AEG claims
22  out of the funnel account is all money that is
23  either yours or Mr. McClure's personally?
24    A.  That's right.

**80**

1    Q.  Okay.  There are no other premium monies
2  coming in the door for outstanding AEG claims;
3  correct?
4    A.  No.
5    Q.  Were you in any way involved in
6  reporting what I'm going to define to be the loss,
7  meaning this AEG-related issue, to American
8  Automobile Insurance Company, the carrier for
9  Mr. McClure?
10    A.  No.
11    Q.  So Mr. McClure would handle all of that?
12    A.  That's right.
13    Q.  Okay.  Are you familiar with Lancer
14  Claim Services?
15    A.  Only in that I saw a letter from them.
16  I assume they were a TPA -- I'm not even sure how
17  American Automobile is involved with Fireman's
18  Fund.  I thought our E&O was with Fireman's Fund.
19    Q.  Right.
20    A.  And I assume that American Automobile is
21  a program business spun off of Fireman's Fund and
22  that Lancer is a TPA hired by American Automobile.
23    Q.  That is generally correct, yes.
24    A.  Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                    April 27, 2010

81

1    Q.    So you were not involved in notifying
2  American Automobile of the issue, it was
3  Mr. McClure. I assume then, also, other than
4  getting the letter you mentioned from Lancer, you
5  didn't have any direct contact from Lancer either?
6    A.    No, I did not.
7    Q.    Okay.
8    A.    I take that back. I had one
9  conversation, a conference call with somebody from
10 Lancer with Brian McClure. And I don't recall who
11 the person was. I cannot even recall the context
12 of the conversation, other than trying to explain
13 to him the relationship of AEG, RCA and these
14 claims. And he had a very difficult time
15 understanding it.
16   Q.    Okay. There is -- were you ever
17 involved in, other than that one conversation, any
18 discussions with AAIC or Lancer about your and
19 Mr. McClure's intent to seek reimbursement for the
20 funds you've been paying directly out of your own
21 pocket?
22   A.    No. I've had discussions with Jeff
23 Scolaro and the law firm about that but never with
24 Lancer and/or the program business.

82

1    Q.    Okay. Do you know approximately how
2  much money has been paid out of the McClure and
3  Ciarrachi funnel account to satisfy AEG claims?
4    A.    Approximately, no, but I could give you
5  a value above a half a million dollars.
6    Q.    Okay. And, again, that would have been
7  approximately a half a million dollars to satisfy
8  approximately 90 percent of the claim?
9    A.    Yes.
10   Q.    So the 10 percent that are still out
11 there, we don't know what that amount is going to
12 be?
13   A.    That's right.
14   Q.    Okay.
15   A.    And those are some heavy claims that are
16 out there. When I say "heavy," I'm talking about
17 should we take the case to the Industrial
18 Commission and lose, there's one or two claims that
19 could be above 100,000 each.
20   Q.    Okay. Part of the subject matter of
21 this lawsuit involves the claim made by Genie
22 relating to the one that you spoke about earlier
23 involving the penalties and such?
24   A.    Yes.

83

1    Q.    Are you familiar with Genie as a client
2  of the AEG insurance?
3    A.    Yes.
4    Q.    Do you know approximately how many
5  workers within Genie have made claims under the AEG
6  program?
7    A.    No, I do not know the number.
8    Q.    Okay. Do you know if any of the claims
9  that were made by workers related to Genie, whether
10 any of those claims were paid?
11   A.    Yes, they were.
12   Q.    Some were?
13   A.    Yes.
14   Q.    Okay. Do you know, other than the one
15 that we talked about earlier that hasn't been paid,
16 do you know that any of them that haven't been
17 paid?
18   A.    Well, they had -- AEG and RCA and Genie
19 had a relationship where they initially were sold a
20 policy at one -- I believe -- I'm going off of
21 memory here, I believe they were sold at one
22 deductible level. They had an onslaught of claims
23 on the initiation of the coverage. So AEG came to
24 us and said we want to cancel the risk. At that

84

1  point, we discussed with them an option to
2  canceling the risk, which was raising the
3  deductible.
4         So we went out to their Joliet office
5  and had a conversation with, I believe, their risk
6  manager or the manager from that office who
7  purchased the insurance product and said if we
8  have -- if we're going to keep this insurance in
9  force, AEG has said we must raise your deductible.
10   Q.    Okay.
11   A.    And he agreed to raise the deductible, I
12 believe it's to $25,000.
13   Q.    Okay. So initial -- just so I'm
14 understanding correctly, initially Genie was placed
15 with AEG Insurance at a certain deductible, too
16 many claims were coming in and AEG felt that it
17 either -- something had to be done and it was
18 either cancelling the program or raising the
19 deductible --
20   A.    Yes.
21   Q.    -- so they at least had their own --
22   A.    We talked them into raising the
23 deductible.
24   Q.    Okay. So it's fair to say, then, that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                        April 27, 2010

                                                                    85
1  every -- any claim involving Genie that came in
2  after the raise of the deductible was a claim in
3  excess of $25,000?
4      A.  No, no, there were some under 25.
5      Q.  Okay.  Was it a -- was it a deductible
6  that was eroded by any claim or did every one claim
7  have to exceed $25,000?
8      A.  Every one would have to exceed 25,000.
9      Q.  Okay.  So if a claim was made that was
10 under $25,000, you would still administer the
11 claim?
12     A.  We'd administer it, go back to Genie and
13 say --
14     Q.  Pay this directly?
15     A.  Pay this directly.
16     Q.  Okay.  So --
17     A.  Or defend it directly.
18     Q.  Okay.  So Genie would still use you for
19 purposes of either negotiating down the claim
20 and/or defending it because this is a ridiculous
21 claim?
22     A.  Yes.
23     Q.  Okay.  If the claim exceeded $25,000
24 deductible and you decided to pay the claim, and it

                                                                    86
1  was in excess of 25, you would still go back to
2  them to pay the 25, you'd pay the difference?
3      A.  That's right.
4      Q.  Okay.  Do you have any independent
5  recollection of when Mr. McClure notified AAIC
6  about Genie's claim, and the one I'm referring to
7  is the one that we've talked about before, the one
8  that's still outstanding?
9      A.  I could only give you an assumption, and
10 I know that's not the proper thing to do in a
11 deposition, but it's all I can do.  And I can tell
12 you that it's probably after we received notice
13 when we were under cease and desist that penalties
14 had been affixed to an award made while a cease
15 desist was under way.
16     Q.  Okay.
17         (WHEREUPON, a certain document was
18         marked Ciarrachi Deposition Exhibit
19         No. 4, for identification, as of
20         April 27, 2010.)
21 BY MR. RICE:
22     Q.  I'm showing you what's been marked as
23 Exhibit 4 for your deposition.  Take a moment to
24 review it and just let me know when you're

                                                                    87
1  finished.
2      A.  Yes.  This -- the entire document you
3  want me to review or just a copy of the letter?
4      Q.  If you could just -- I don't want you to
5  read every page of it, I just want --
6      A.  I'm familiar with it because this is
7  something that -- I mean, I was extremely upset
8  about it because I thought the arbitrator
9  overstepped his bounds.
10     Q.  Okay.
11     A.  And he went and he affixed penalties in
12 something under a cease and desist order.
13     Q.  Okay.  So you obviously recognize
14 Exhibit No. 4; is that correct?
15     A.  Yes.
16     Q.  And what is it?
17     A.  It's a notice that they've affixed
18 penalties because the original award wasn't
19     Q.  And I guess a better question would
20 been what is Page 1 of Exhibit 4, is that a letter
21 you prepared?
22     A.  Yes, but to the office of the special
23 deputy.
24     Q.  And when was this letter prepared?

                                                                    88
1      A.  It's dated January 30th, and that was
2  after I had our -- remember I talked about a
3  discussion we had with the office of the deputy
4  special about the Ramirez case and the fact they
5  could have penalties taken off, so that was when I
6  sent the file over to them per my discussion with
7  their vice president of claims.
8      Q.  Okay.  Is that your signature on Page 1
9  of Exhibit 4?
10     A.  No, that's not mine.  I imagine it's my
11 secretary's.
12     Q.  Did you authorize her to sign this
13 letter for you?
14     A.  I'm sure I did.
15     Q.  Did you ever receive a response from the
16 special deputy --
17     A.  No.
18     Q.  Let me just finish my question.  Did you
19 ever receive a response to Exhibit -- from
20 Exhibit 4 from the special deputy?
21     A.  No.
22     Q.  Okay.  Did you ever follow up with him
23 about this letter?
24     A.  In phone conversations and through our



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                      April 27, 2010

89

1  attorney.
2      Q.   And still to this day, you've never
3  received a response?
4      A.   No.
5      Q.   And you have no independent knowledge as
6  you sit here today what their response has been as
7  to this particular claim?
8      A.   That's right.
9      Q.   Again, I just want to make sure I
10  understand, those files that are closed involving
11  AEG claims, you had indicated there's only two ways
12  a file can be closed, either the statute of
13  limitations has expired or you get essentially a
14  settlement agreement?
15     A.   Yes.
16     Q.   And the agreement would be signed by
17  Ciarrachi and McClure as well as the claimant, or
18  who would all be a part of that --
19     A.   I basically would sign off as a
20  representative of Brimar Administration and the
21  petitioner attorney would sign off.
22     Q.   Okay.
23     A.   And the client, the injured employee.
24     Q.   Okay.  Because I saw, again, in the

90

1  cover of the few files -- or the files that I did
2  review, I saw on the first inside of each file
3  jacket, on some of them, essentially what I would
4  believe to be a settlement agreement.  Does that
5  sound familiar to you?
6      A.   Yeah, you would see a settlement
7  agreement.  It's got like a pink colored sheet --
8      Q.   Yes.
9      A.   Mm-hmm.
10     Q.   Were you in any way involved in the
11  procurement of the AAIC policy that Mr. McClure
12  purchased, which is the subject of this lawsuit?
13     A.   No.
14     Q.   So McClure bought his own insurance for
15  his business and you weren't involved in that?
16     A.   Well, he bought coverage for our entire
17  operation.
18     Q.   Okay.  So does Brimar have any other
19  insurance?
20     A.   No.
21     Q.   So it's your understanding that Brimar
22  would be covered under Mr. McClure's policy?
23     MR. SCOLARO:  Objection to the extent my
24  client is not -- cannot make the legal

91

1  determination as far as what coverage he's
2  involved, and it calls for a legal conclusion.  But
3  to the extent that he understands the question, he
4  can go ahead and answer.
5  BY THE WITNESS:
6      A.   Well, his policy that he purchased was
7  for the -- the administration and the placing of
8  coverage.  It was a policy that it was my
9  assumption covered the entire LLC of our entire
10  business operation.
11  BY MR. RICE:
12     Q.   Okay.  Have you ever seen a copy of the
13  AAIC policy?
14     A.   No, and that was an issue that he and I
15  discussed because no policy was ever issued to
16  As I understood it, we merely received a
17  certificate of insurance and never the actual
18  policy.
19          Now, I understand, after we complained
20  about it, you can now go on-line and secure a copy
21  of the policy.  But at the time we wrote that
22  policy, we were never actually given a physical
23  policy.
24     Q.   Were you in any way involved in

92

1  requesting a copy of the policy?
2      A.   Before or after?
3      Q.   Well, let's do this:  When Mr. McClure
4  enrolled in the AAIC program, were you -- you
5  weren't involved in that process; right?
6      A.   No.
7      Q.   Okay.  Have you ever made a request to
8  AAIC, you personally, asking for a copy of the
9  policy --
10     A.   No.
11     Q.   -- at any point?
12     A.   Not personally.  I've gone through Brian
13  after the fact and said to Brian, "We need a copy
14  of this policy and we should have had a copy of
15  this policy."
16     Q.   And when you say "after the fact," you
17  mean after what?
18     A.   After all of the claims had occurred and
19  after all of the cease and desist had occurred and
20  the issues of AEG and RCA had come on the table.
21     MR. RICE:  I don't have any further questions.
22     MR. SCOLARO:  I do.  I have a few points I
23  want to clarify, but --
24     MR. RICHARDS:  Go ahead.  I'm not sure I'm



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

93

1  going to have any.

2              CROSS EXAMINATION

3  BY MR. SCOLARO:

4       Q.   Dave, we talked about -- or Dana talked

5  about as far as the AAIC policy, that it was -- and

6  I believe you testified to the fact that Brian was

7  the one that procured that policy, and when I say

8  "Brian", I mean Brian McClure. That's correct?

9       A.   That's right.

10      Q.   And as you understand it, any damages

11 that arose pursuant to this matter and pursuant to

12 the AEG insolvency would have been damages as a

13 result of McClure's placement of insurance with

14 that company, being AEG?

15      A.   That's right.

16      Q.   And also that those damages were

17 performed by McClure and Associates or their

18 and those agents are licensed brokers and insurance

19 agents; correct?

20      A.   That's right.

21      Q.   Okay. Now, with respect to those

22 damages and with respect to payments and claims

23 that were settled on those things, Dana also

24 mentioned this was something that Brian had talked

94

1  about, there's a McClure and Ciarrachi funnel

2  account is what we've termed it in this deposition?

3       A.   That's right.

4       Q.   Now, I want to clarify something. I

5  think Dana referred to it a couple of times as

6  personal funds. But that's -- to that extent,

7  those funds, and it was something I believe you

8  alluded to, those funds are not personal in the

9  sense that they're Brian McClure and Dave

10 Ciarrachi's personal money; is that correct? In

11 other words, and maybe this is a better question,

12 the McClure and Ciarrachi funnel account consists

13 of funds from B.D. McClure and Associates and

14 Brimar Administration, Inc.; correct?

15      A.   That's right.

16      Q.   And you're not -- because you're not an

17 accountant, you do not -- you're not aware of the

18 specific dynamic of which funds come from -- how

19 much funds are coming from Brimar, how much of the

20 funds are coming from McClure; is that correct?

21      A.   No, I think Barb Gast would be the only

22 person who would know that. I would assume she

23 would know that, she's the keeper -- she's the --

24 she does the billing and she does the receivables

95

1  and so I'm assuming she would know that.

2       Q.   Okay. Now, with respect to the

3  reason -- with respect to settling of claims, we

4  talked earlier, and I believe you testified to the

5  fact that, in part, it was a moral obligation you

6  felt to step in and pay these claims; correct?

7       A.   Yes.

8       Q.   But would it also be fair to say that

9  you also felt that ultimately your clients would --

10 were threatening to go after you for that money as

11 well?

12      MR. RICE: Objection: Calls for speculation.

13 BY THE WITNESS:

14      A.   I will answer the question this way in

15 due respect to his -- the answer to that question

16 is we were concerned that there would be a

17 value to every claim as time goes on, because in

18 40-plus years in the insurance business, claims

19 don't decrease in value, they increase in value.

20 BY MR. SCOLARO:

21      Q.   And would you say that the Jason Ramirez

22 case is indicative of that?

23      A.   Absolutely.

24      Q.   And with respect to the Jason Ramirez

96

1  case, Genie had actually tendered that claim to you

2  for payment; is that not correct?

3       A.   They tendered the claim as a first

4  report of injury.

5       Q.   Sure. And then thereafter, once AEG

6  went insolvent, it was also then tendered to B.D.

7  McClure and Associates for payment?

8       A.   After it went -- after -- the case was

9  filed at the Illinois Industrial Commission. There

10 was a hearing heard at the Illinois Industrial

11 Commission during the period of the cease and

12 desist. And during that period of time, the

13 arbitrator made an award. There could be no

14 payment made by anybody when the cease and desist

15 occurred, and for some reason the arbitrator

16 awarded penalties to Mr. Ramirez because there's a

17 time frame when you must honor the payment of any

18 award made at the Illinois Industrial Commission.

19 I believe that's a 30-day period. And after

20 30 days, they have the right to affix penalties.

21          When a cease and desist has occurred, we

22 had no option to pay any claim and no action could

23 be taken forth on any claim of the AEG/RCA program.

24 Yet he saw fit to award penalties.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

97

1    Q.  Okay.  Understood.
2        And then once those penalties were
3    awarded, is it also accurate to say, then, that
4    Genie and/or Dale Sippel tendered this -- the award
5    to you requesting that Brian -- that B.D. McClure
6    and Associates pay that?
7    A.  That's right.
8    Q.  Okay.  And lastly, Dana had asked a
9    couple questions about how many alternatives were
10   presented to clients of B.D. McClure and Associates
11   with respect to potential alternatives as far as an
12   alternative to AEG and things like that.  Those
13   would be questions better suited for -- would it be
14   accurate to say that those questions would be
15   better suited for a producer, such as those
16   employed by B.D. McClure and Associates?
17   A.  Well, the fact that I don't have a
18   producer's license doesn't mean that I couldn't
19   answer those questions because, obviously, I'm
20   familiar with production as well as administration.
21   Q.  Sure.
22   A.  So I could quantify an insured as to
23   what his options are, as could any producer.
24   Q.  Okay.  But the ones, then, offering

98

1    ultimately those policies would be the producer
2    employed by or an agent of B.D. McClure and
3    Associates?
4    A.  That's correct.
5    MR. SCOLARO:  Okay.  That's all I wanted.
6    MR. RICHARDS:  I have one follow-up and it
7    relates to Genie in particular.
8            CROSS EXAMINATION
9    BY MR. RICHARDS:
10   Q.  Is Brimar continuing to administer
11   claims for Genie that were incurred while AEG was
12   on the risk?
13   A.  Yes.
14   Q.  Do you have a ballpark idea,
15   Mr. Ciarrachi, of how many claims Brimar is
16   continuing to handle?
17   A.  There's a couple out there that we have
18   with a law firm named Powers & Cronin, and also
19   with Scopolias (phonetic).  They're both workers'
20   compensation firms.
21   Q.  Okay.
22   A.  And we have -- we have this deductible
23   issue, and we have tendered their legal bills to
24   Genie noting that they are asking for payment.  So

99

1    there's some issues now that are developing in that
2    the law firms are threatening not to represent
3    Genie because they haven't made payments of the
4    legal bills which fall into the deductible.
5    Q.  Do you still have copies of the legal
6    bills that you just referred to that you've
7    tendered to Genie?
8    A.  I'm sure they're in the files.
9    MR. RICHARDS:  Okay.  We would ask that they
10   be produced to our office so we can follow up.
11   MR. SCOLARO:  And that's something --
12   MR. RICHARDS:  Something Jeff and I have
13   spoken about a little bit.
14   MR. SCOLARO:  Correct.
15   MR. RICE:  I will say for the record that in
16   my brief review of some of those files, I have seen
17   attorney bills.  I can't say that I saw any
18   relating to particularly Genie, but I have seen the
19   Scopolias firm letterhead in there on a few of
20   them, so those are things that I know have been
21   kept in some of these files.
22   MR. SCOLARO:  That's something that Paul and I
23   have also spoken about and continue to speak about
24   even now.

100

1    THE WITNESS:  I think some of them that you've
2    sent checks on and some you have not.  That's what
3    I know about --
4    MR. SCOLARO:  I don't know if Paul is --
5    that's something Paul has to check with and that's
6    kind of where we are with that, so --
7    BY MR. RICHARDS:
8    Q.  Mr. Ciarrachi, have you had any further
9    contact with Mike Ward since any of this dispute
10   arose?
11   A.  No.
12   Q.  Is Mike Ward continuing in the PEO
13   business, do you know?
14   A.  I don't know, but just as a personal
15   aside, I will say that I -- to my amazement, this
16   is a man we gave over $6 million to, and to my
17   amazement, nothing has happened to Mike Ward.
18   Q.  When you say nothing has happened, he
19   hasn't been indicted or thrown in jail or --
20   A.  He hasn't been indicted, the IRS hasn't
21   gone after him, the Department of Insurance hasn't
22   gone after him, the office of the special deputy
23   hasn't gone after him, to the best of my knowledge.
24   Q.  Okay.  But you don't know whether he



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                         April 27, 2010

101

1    continues to operate --
2        A.    No.
3        Q.    -- in the PEO industry, do you?
4        A.    No, I don't.
5        Q.    To your knowledge, do either Brimar or
6    McClure and Associates place any business presently
7    with any PEO?
8        A.    No.
9        Q.    At the time that you are placing
10   insurance with the AEG program, at that point in
11   time or prior to that, had you ever been placing
12   business with a PEO?
13       A.    No.
14       Q.    Did you know back then that AEG was a
15   professional employer organization?
16       A.    At the time we placed business, yes,
17   because they have a license -- the State of
18   Illinois issues a license for that, and we checked
19   to make certain that they were licensed by the
20   State.
21       Q.    As a PEO?
22       A.    That's right.
23       Q.    Okay.  Do you have any knowledge as to
24   whether or not the Illinois Insurance Guaranty Fund

102

1    would step in when a PEO goes insolvent, as
2    compared to an insurance company going
3        A.    I can't answer that for sure, but it was
4    my understanding that when you have a fronting
5    company and then an excess carrier, that it
6    fall from the fronting company to the excess
7    company to the Guaranty Fund.  That would be
8    understanding of the stepladder of claims as to
9    they would fall.
10       MR. SCOLARO:  And then that was your
11   was that, then, Dave, your understanding with
12   respect to this situation with AEG and RCA?
13       THE WITNESS:  Yes.
14   BY MR. RICHARDS:
15       Q.    So, in other words, when AEG is
16   insolvent, the risk would go to RCA?
17       A.    Yes.
18       Q.    Before it would go to the Illinois
19   Insurance Guaranty Fund?
20       A.    Yeah, because the way I understood the
21   program is that there was a million dollar
22   deductible taken by a syndicate group of people,
23   the AEG group, so they're responsible for the
24   million dollars of the claim.  Then there was a

103

1    excess policy written through RCA, and then you
2    always have the -- and I -- I know for a fact that
3    RCA was admitted and licensed in the State of
4    Illinois.  If they're admitted and licensed in the
5    State of Illinois, they would pay taxes towards the
6    Guaranty Fund.  So it then would be my assumption
7    that it would fall to the Guaranty Fund.  And this
8    is all assumption, but that's the way I felt the
9    tiers would work.
10       Q.    In the situation that we have here,
11   though, where AEG was declared insolvent but RCA
12   was not, would you have an understanding as to what
13   obligation, if any, the Guaranty Fund would have in
14   this situation?
15       A.    It's my understanding that RCA is
16   claiming there wasn't a relationship with AEG, and
17   to that end, I actually called an attorney in New
18   York who Mike Ward gave me, stating that he could
19   clarify the issues between AEG and RCA.  I talked
20   to him three or four different occasions, and he
21   told me that there was a discussion -- a dispute
22   between the two of them, but he assured me that
23   that was going to be resolved and there were no
24   issues.  I cannot recall his name right now, but

104

1    I'm sure I've got that somewhere where I've got the
2    name of the attorney involved.
3        MR. RICHARDS:  That's all I have.
4        MR. RICE:  I just have two follow-up.  Do you
5    have --
6        MR. SCOLARO:  No, that's all I have.
7               REDIRECT EXAMINATION
8    BY MR. RICE:
9        Q.    Counsel had asked you about the reasons
10   why you decided to pay these claims, and your
11   response was that to mitigate the damages.  Do you
12   remember that?
13       A.    Yes.
14       Q.    Did anybody or any of the clients that
15   submitted claims ever threaten to sue you or
16   Mr. McClure if you didn't make the payment?
17       A.    I think -- Genie -- Genie through their
18   attorney.
19       Q.    Okay.  Aside from Genie making that
20   representation to you, did any other client do
21   that?
22       A.    No, because we paid them all.
23       Q.    Okay.  Aside from the one lawsuit where
24   Genie just filed, have you or Mr. McClure or Brimar



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DAVID A. CIARRACHI                                            April 27, 2010

---

105

1  or McClure and Associates ever been named as a
2  defendant involved in a case like this?
3      A.  No.
4      MR. RICE:  Okay.  I have no further questions.
5      MR. SCOLARO:  I don't either.
6      MR. RICE:  Do you want to waive signature,
7  reserve it?
8      MR. SCOLARO:  Dave, to explain, you have the
9  opportunity to review the transcript for any errors
10  or things that you would like to clarify -- well,
11  not clarify, any errors in the transcript.  It
12  wouldn't be an opportunity to change anything
13  you've said but to correct any potential transcript
14  errors.  It's our recommendation typically to waive
15  signature.
16      THE WITNESS:  Then we'll waive it.
17      MR. SCOLARO:  Okay.
18          FURTHER DEPONENT SAITH NOT.
19
20
21
22
23
24

---

107

1          IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Woodridge,
3  Illinois, this 23rd day of August, A.D. 2010.
4
5
6
7
8          Notary Public, DuPage County, Illinois.
9
10
11  ALICE M. SCHWINGER, CSR No. 84-2913
12
13
14
15
16
17
18
19
20
21
22
23
24

---

106

1  STATE OF ILLINOIS  )
2                     ) SS:
3  COUNTY OF DUPAGE   )
4      I, ALICE M. SCHWINGER, CSR No. 84-2913,
5  a Notary Public within and for the County of
6  DuPage, State of Illinois, and a Certified
7  Shorthand Reporter of said state, do hereby
8  certify:
9      That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13      That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony
17  given and the proceedings had;
18      That the said deposition was taken
19  before me at the time and place specified;
20      That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.

---

108

1              EXAMINATION
2                     Page   Line
3  WITNESS NAME
4  DAVID A. CIARRACHI
5  Direct Examination By Mr.       3      6
6  Rice:
7  Cross Examination By Mr.       93
8  Scolaro:
9  Cross Examination By Mr.       98
10  Richards:
11  Redirect Examination by Mr.    104
12  Rice:
13
14            E X H I B I T S
15  Deposition Exhibit           Page  Line
16      No. 1........................  43   22
17      No. 2........................  56    4
18      No. 3........................  71   15
19      No. 4........................  86   19
20
21
22
23
24

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com